**John FISHER, Plaintiff Below, Appellant,**

v.

**TOWNSENDS, INC., Defendant Below, Appellee.**

No. 308, 1996.

Supreme Court of Delaware.

Submitted: April 15, 1997.
Decided: June 11, 1997.

Harold Schmittinger, William D. Fletcher, Jr. (argued), and Jeffrey J. Clark, of Schmittinger & Rodriguez, P.A., Dover, for appellant.

Mark L. Reardon and William F. Taylor, Jr. (argued), of Elzufon & Austin, P.A., Wilmington, for appellee.

Before VEASEY, C.J., HOLLAND and HARTNETT, JJ.

HOLLAND, Justice:

This appeal arises out of a motor vehicle accident in which the plaintiff-appellant, John Fisher ("Fisher"), was seriously injured. At the time of the accident, Fisher was a passenger in a pickup truck being driven by Percy Reid ("Reid"). Fisher's complaint alleged that the defendant-appellee, Townsends, Inc. ("Townsends"), was vicariously liable for Reid's negligent conduct while driving the truck.[1] Fisher also alleged that Townsends was independently negligent for hiring Reid.

This is Fisher's direct appeal. Fisher contends that the Superior Court erred by granting Townsends' summary judgment motion on the allegation of vicarious liability. According to Fisher, the facts of the record, when viewed in the light most favorable to Fisher, precluded the Superior Court from granting summary judgment.

This Court has concluded that the record reflects a material dispute of facts about whether Reid was Townsends' agent. That factual dispute should have been submitted to the jury. Accordingly, the summary judgment entered by the Superior Court in favor of Townsends on the issue of vicarious liability must be reversed.

### Procedural Facts

Townsends made a pre-trial motion for summary judgment. First, Townsends argued that Reid was an independent contractor, thereby rendering the doctrine of *respondeat superior* inapplicable. Second, Townsends argued that, as a matter of law, it was not negligent for hiring Reid.

The Superior Court granted Townsends' motion on the issue of vicarious liability. It concluded that Reid was an independent contractor and, consequently, as a matter of law, could not have his negligence imputed to Townsends. The Superior Court denied Townsends' motion for summary judgment with regard to Fisher's allegation of its negligence in hiring Reid.

At trial, the Superior Court granted a directed verdict in favor of Fisher on the issue of Reid's liability. The factual issue of Townsends' negligence in hiring Reid, however, was submitted to the jury. The jury found that Townsends was not negligent in hiring Reid. The jury awarded Fisher damages against Reid in the amount of seven million dollars.

### Townsends and Reid
### Facts of Relationship

Townsends operates a chicken processing business. Townsends' Delaware plant processes approximately 1,350,000 chickens per week. Consequently, each day an average of more than 250,000 chickens are caught and delivered to Townsends for processing. Townsends operates two shifts each day to accomplish these results.

Townsends hired seven weighmasters to assemble chicken catching crews. Those crews remove live birds from chicken houses on farms operated by Townsends' growers.

---

1. Fisher's complaint also alleged that Reid was directly liable for his own negligence. Reid is not a party in this appeal.

The catchers load the chickens into cages for transportation to Townsends' processing plant in Millsboro, Delaware.

Townsends hired Reid as a weighmaster. Reid performed his services as a weighmaster for Townsends exclusively, for at least five years prior to the time of Reid's accident involving Fisher.[2] The relationship between Townsends and Reid continued pursuant to oral understandings until the summer of 1992.

In July 1992, Townsends presented Reid with a written Catching Crew Agreement. The parties disagree about whether the Catching Crew Agreement was executed prior to Reid's accident.[3] There is a consensus, however, that the written agreement was not intended to change or alter the nature of the longstanding relationship between Reid and Townsends.

Each chicken catching crew consisted of seven members and a foreman. Each crew was transported to and from work sites in vehicles that Reid owned. The catchers were generally picked up at their homes by a foreman in the vehicles assigned to each crew by Reid.

At each farm, the catchers physically removed the birds from the chicken houses and placed them into cages that Townsends provided. A Townsends' employee forklift operator was responsible for placing the empty cages on stools in the chicken houses and returning the full cages to the trucks for hauling. Townsends' employees transported the chickens on its tractor trailers from the farms to its processing plant. Townsends also hired a Live Haul Manager, who would visit its growers' farms periodically, to see if the weighmasters, forklift operators or truck drivers were experiencing problems.

Townsends coordinated its operations with a daily work order known as a Flock Movement Sheet. These sheets were distributed each day throughout its system. The sheet identified the various farm locations that the weighmasters, forklift drivers and chicken cage truck drivers would report to for each day's work.

Everyone involved in the collection and transportation of Townsends' chickens to its plant was required to comply with the Flock Movement Sheet. Townsends' Live Haul Manager oversaw the entire chicken catching, loading, and hauling process, including the weighmasters' actions. The Live Haul Manager would normally deal directly with the weighmasters. These communications included requesting the weighmasters to correct the chicken catchers conduct. If a weighmaster failed to take corrective action, Townsends could direct the weighmaster to discharge the chicken catchers, or terminate the weighmaster himself.

Townsends supplied Reid with a Flock Movement Sheet everyday. Each sheet identified: the farm where the day's work was to be done; the total number of birds to be removed; which of Reid's crews was assigned to the job; the time that the crew was to report; and the number of birds to be placed in each cage, to keep the birds from overheating and dying. In addition, Townsends supplied the cages for the chicken catching crews to use. Townsends also provided the chicken catchers with paper masks and disposable gloves.

---

**2.** The record reflects that at the time of the incident giving rise to this litigation, all of the weighmasters hired by Townsends worked for it exclusively.

**3.** According to Townsends, Reid entered into a Catching Crew Agreement ("Agreement") dated July 23, 1992 to provide chicken catching services. Pursuant to the Agreement, Reid agreed to assemble a chicken catching crew who would remove chickens from farms Townsends' growers operated for shipment to Townsends' processing plant in Millsboro, Delaware. The Agreement recited that Reid was an independent contractor and that the chicken catchers whom he employed were not employees or agents of Townsends. The Agreement further stated that Reid was solely responsible for hiring, compensating, directing and, if necessary, terminating the chicken catchers. It further made Reid responsible for the transportation of the chicken catching crews and required him to pay all state and federal taxes "and all applicable charges or taxes for Worker's Compensation Insurance, Unemployment Compensation Insurance, FICA or other statutory obligations." The Agreement provided that Reid was to be paid "$27.08 for each 1,000 birds properly caught." According to Fisher, there is a factual dispute about whether the written agreement was signed by Reid prior to the accident.

Townsends required its weighmasters to keep two way radios in the vehicles they used to transport their crews. In fact, Townsends supplied Reid with radios for both of his transport vehicles. These radios permitted Townsends to advise Reid and its other weighmasters of changes in work sites or daily orders. Similarly, the radios enabled the weighmasters to communicate with Townsends about any work-related problems.

Pursuant to Reid's oral agreement with Townsends, Reid assembled two chicken catching crews. They were denominated, for identification purposes, as Crew 1 and Crew 2. Fisher was a member of Crew 2.

Charles Pitts ("Pitts") was the foreman of Crew 2. The vehicle assigned to Crew 2 was a 1980 Ford van.[4] As the foreman, Pitts picked up the members of Crew 2 in the 1980 van and drove them to each day's work sites.

### Fisher's Injury
### Facts of Accident

On July 31, 1992, all members of Crew 2 had been picked up by Pitts as usual. The members of Crew 2 completed a job on the Dukes' farm at approximately one o'clock in the afternoon. The crew could not leave the site, however, because of a malfunction in the 1980 Ford van's transmission. Pitts called Reid for alternate transportation.

Reid arrived in a 1979 Chevrolet pickup truck between 4:30 and 5:00 p.m. The bed of the 1979 truck was similar to the 1985 truck that was regularly used to transport the members of Crew 1. It was covered with a pick-up top and contained bus seats that did not have seatbelts.

Reid drove and Pitts sat in the cab with him. Fisher and six other employees sat in the back bed of the pickup truck. Reid proceeded southbound on State Route 5 in Sussex County, Delaware.

As part of his weighmaster's job, Reid was required to go to Townsends' processing plant in Millsboro at the end of each day to receive a Flock Movement Sheet for the next day's work. Reid was on his way to obtain such a work order when the accident occurred that injured Fisher. It took place approximately .3 miles south of Harbeson, Delaware.

Reid approached the back of a vehicle driven by Cheryl Tucker ("Tucker"). Tucker testified that she saw Reid's truck through her rearview mirror. According to Tucker, Reid's vehicle appeared to be traveling extremely fast and she believed the Reid truck was going to strike her. Tucker moved to the shoulder of the road. Tucker observed Reid's truck swerve into the northbound lane and strike a telephone pole.

As a result of the accident, Fisher suffered serious injuries. He was hospitalized for more than four months. He is now a "C–5 quadriplegic."

### Principal and Agent
### Vicarious Liability Doctrine

Fisher alleges that he was personally injured by the tortious physical conduct of Reid. Fisher further asserts that Reid is an agent of Townsends. Accordingly, Fisher seeks redress against Townsends, as the alleged principal of Reid, on the basis of vicarious liability—*respondeat superior.* Townsends' defense is that Reid was not its agent.

When a third-party plaintiff's legal theory is based upon vicarious liability, several types of relationships must be identified and distinguished: principal/agent; master/servant; employer/employee; agent-independent contractor and non-agent independent contractor. These distinctions are important in evaluating a defendant's liability to third parties who are harmed by the tortious physical act of another. In fact, the distinctions are often outcome determinative.

■ The principal/agent relationship is generic. "An agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent." *Sears Mortgage Corp. v. Rose,* N.J.Supr., 634 A.2d 74, 79 (1993); *see* RESTATEMENT (SECOND) OF

---

4. Reid used a 1985 Chevrolet pickup to move the members of Crew 1 to and from work. The bed of the 1985 truck was covered with a cap top and contained bus seats without seatbelts.

AGENCY § 1 (1958). One type of principal/agent relationship is characterized by the term "master/servant." RESTATEMENT (SECOND) OF AGENCY § 2. Servants are subject to physical control by the principal and are, generally, employees of the principal. *See id.* All masters are principals and all servants are agents.

◾ There are some agents, however, who are not servants. All agents who are not servants are regarded as independent contractors. *See* RESTATEMENT (SECOND) OF AGENCY §§ 1, 2, 220; *see also id.* § 1 cmt. d, e; *id.* § 2 cmt. a; *id.* ch. 7 tit. B Introductory Note (preceding § 219). In addition, all nonagents who contract to do work for another are also termed "independent contractors." Consequently, there are agent-independent contractors and non-agent independent contractors. RESTATEMENT (SECOND) OF AGENCY § 14N & cmt. a, b.

◾ Two general rules establish the framework for determining vicarious liability. The first general rule is that if the principal is the master of an agent who is a servant, the fault of the agent, if acting within the scope of employment, will be imputed to the principal by the doctrine of *respondeat superior.*[5] *Fields v. Synthetic Ropes, Inc.,* Del. Supr., 215 A.2d 427, 432 (1965); *see Draper v. Olivere Paving & Constr. Corp.,* Del.Supr., 181 A.2d 565, 569–70 (1962); *see also Wilson v. Joma, Inc.,* Del.Supr., 537 A.2d 187, 189 (1988) (identifying criteria for determining whether conduct of servant is within scope of employment). The second general rule is that an owner or contractee will not be held liable for the torts of an independent contractor which are committed in the performance of the contracted work. *See Schagrin v. Wilmington Med. Ctr., Inc.,* Del.Super., 304 A.2d 61, 63–64 (1973); *see also O'Connor v. Diamond State Tel. Co.,* Del.Super., 503 A.2d

661, 663 (1985); *Seeney v. Dover Country Club Apartments, Inc.,* Del.Super., 318 A.2d 619, 623–24 (1974). The second general rule has been substantially eroded by numerous exceptions. *See O'Connor v. Diamond State Tel. Co.,* 503 A.2d at 663; *Seeney v. Dover Country Club Apartments, Inc.,* 318 A.2d at 623; *Schagrin v. Wilmington Med. Ctr., Inc.,* 304 A.2d at 64; *see also* RESTATEMENT (SECOND) OF TORTS §§ 410–429 (1965)[6]; W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 71, at 509–16 (5th ed.1984). For example, if the owner or contractee retains control over the activities of an independent contractor, the owner or contractee will be held liable for the torts of the independent contractor. *See O'Connor v. Diamond State Tel. Co.,* 503 A.2d at 663; *Seeney v. Dover Country Club Apartments, Inc.,* 318 A.2d at 623.

### *Master/Servant Employer/Employee*

Because all employers are masters and all employees are servants, the terms employer/employee are often used interchangeably to denote a master/servant relationship. *See Gooden v. Mitchell,* Del.Super., 21 A.2d 197, 200 (1941). The appellations employer and employee, however, are used most frequently in determining workers' compensation rights or obligations. *See White v. Gulf Oil Corp.,* Del.Supr., 406 A.2d 48 (1979); *Price v. All Am. Engineering Co.,* Del.Supr., 320 A.2d 336, 339 (1974); *Lester C. Newton Trucking Co. v. Neal,* Del.Supr., 204 A.2d 393 (1964). Accordingly, the words employer and employee have become imbued with the connotations that arise from the implications of that direct relationship pursuant to the workers' compensation statute. *See White v. Gulf Oil Corp.,* 406 A.2d at 50–52.[7] Consequently,

---

5. Literally, *respondeat superior* means "[l]et the master answer." BLACK'S LAW DICTIONARY 1475 (4th ed.1951). Pursuant to this doctrine, a master is liable in certain cases for the wrongful acts of his servant and a principal for those of his agent. *Id.*

6. RESTATEMENT (SECOND) OF TORTS §§ 409–429 (listing exceptions to general rule, e.g., negligence of employer in selecting, instructing, or supervising contractor; non-delegable duties of employer

arising from relation to public or particular plaintiff; or inherently dangerous work).

7. When eligibility for workers' compensation is at issue, four factors are generally considered in determining whether a relationship is that of an employer and employee. *Lester C. Newton Trucking Co. v. Neal,* 204 A.2d at 394–95. These four factors are: who hired the person; who may discharge the person; who pays the person's

in situations like the case *sub judice*, when the issue is vicarious liability to a third party, use of the terms master and servant eliminates any unnecessary confusion.

### Principal/Agent
### Servant or Independent Contractor

■ Depending upon the right of control capable of being exercised by the principal, agents are characterized either as servants or independent contractors. If the principal assumes the right to control the time, manner and method of executing the work, as distinguished from the right merely to require certain definite results in conformity to the contract, a master/servant type of agency relationship has been created. *See Gooden v. Mitchell*, Del.Super., 21 A.2d 197, 200–01 (1941). If, however, the worker is not subject to that degree of physical control, but is subject only to the general control and direction by the contractee, the worker is termed an independent contractor. *See Gooden v. Mitchell*, 21 A.2d at 200–01. The right of control is only one component on the list of considerations that must be balanced to determine whether a person is a servant or an independent contractor. *See White v. Gulf Oil Corp.*, 406 A.2d at 51 (citing RESTATEMENT (SECOND) OF AGENCY § 220 (1958)). *See generally* ROBERT W. WOOD, LEGAL GUIDE TO INDEPENDENT CONTRACTOR STATUS (2d ed.1996).

In determining whether one who acts for another is a servant or an independent contractor, this Court has recognized Section 220 of the *Restatement (Second) of Agency* as an authoritative source for guidance. *White v. Gulf Oil Corp*, 406 A.2d at 51. The *Restatement (Second) of Agency* states that the following non-exclusive "matters of fact" are to be considered in deciding whether the actual tortfeasor is a servant or an independent contractor:

(a) the extent of control, which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

RESTATEMENT (SECOND) OF AGENCY § 220.

■ Accordingly, in making the determination of whether a person is a servant or an independent contractor, this Court has "recognize[d] that no single rule could be laid down to determine whether a given relationship is that of [a servant to a master] as distinguished from an independent contractor." *White v. Gulf Oil Corp.*, 406 A.2d at 51. Instead, " '[e]ach particular case must . . . depend on its own facts.' " *Id.* (quoting *Gooden v. Mitchell*, Del.Super., 21 A.2d 197, 201 (1941)); *see Sussex County v. Morris*, Del. Supr., 610 A.2d 1354, 1360 (1992); *Mechell v. Palmer*, Del.Supr., 343 A.2d 620, 621 (1975); *see also Morris v. Blake*, Del.Super., 552 A.2d 844, 849 (1988), *aff'd sub nom. Sussex County v. Morris*, Del.Supr., 610 A.2d 1354 (1992). That determination is ordinarily made by the factfinder. *See Billops v. Magness Constr. Co.*, Del.Supr., 391 A.2d 196, 198 (1978); *Mechell v. Palmer*, 343 A.2d at 621–

wages; and who has the power to control the conduct of the person in the performance of the particular job in question. *Id.* at 395. In the workers' compensation context, this Court has

recognized that the fact given predominant consideration in determining an employment relationship is that of right to control. *Id.; see White v. Gulf Oil Corp.*, 406 A.2d at 51.

22; *Gooden v. Mitchell,* 21 A.2d at 201; *see also Sussex County v. Morris,* 610 A.2d at 1360.

### Material Factual Dispute
### Servant or Independent Contractor

Townsends argues that Reid was not its servant. First, Townsends submits that Reid executed a written Catching Crew Agreement prior to the accident that injured Fisher. That agreement recited that Reid was an independent contractor. Second, Townsends asserts that it did not have or exercise the right to control the precise manner in which Townsends carried out his duties as a weighmaster. According to Townsends, Reid was in business for himself. Thus, Townsends submits that it is not answerable to Fisher for Reid's negligence.

▆▆▆▆ The intent of the parties is a relevant sub-factor in determining the right of control. *See Loden v. Getty Oil Co.,* Del.Super., 316 A.2d 214, 217, *aff'd,* Del.Supr., 326 A.2d 868 (1974). In determining a worker's status, "the formal contract between the parties may not indicate the relationship which existed in actual practice between the parties." *Id.* Therefore, the "label by which parties to a relationship designate themselves is not controlling." *Singleton v. International Dairy Queen, Inc.,* Del.Super., 332 A.2d 160, 163 (1975); *see Loden v. Getty Oil Co.,* 316 A.2d at 217.

▆▆▆▆ It is the actions taken by the parties, not the terms used in the contract, that are dispositive in determining whether they were principal and agent respectively. The record reflects that Townsends supplied Reid with Daily Movement Sheets that identified the farm where the day's work was to be done; the total number of birds to be removed; the number of birds to be placed in each cage hold; which crew was assigned to the job; and the time that the crew was to report. Townsends owned and supplied the trucks, forklifts, cages, and stools that were used when the chickens were caught, as well as the paper masks and disposable gloves worn by the catchers. Townsends' Live Haul Manager visited the farms periodically to see if the weighmasters, Townsends' truck drivers, or forklift operators were experiencing problems. Townsends required its Weighmasters to keep two way radios in the vehicles they used to transport their crews. Townsends supplied Reid with radios for both of his transport vehicles. These radios permitted Townsends to keep its weighmasters advised of changes in work sites and work orders. The radios also enabled the weighmasters to communicate with Townsends' processing plant, truck drivers, and forklift operators regarding any work-related problems.

The foregoing evidence, when taken into consideration with the exclusive and long-standing nature of Reid's relationship with Townsends, created a material dispute of fact about whether Reid was Townsends' servant or an independent contractor. That determination must be made by the jury. *See Billops v. Magness Constr. Co.,* Del.Supr., 391 A.2d 196, 198 (1978); *Mechell v. Palmer,* Del.Supr., 343 A.2d 620, 621–22 (1975); *see also Sussex County v. Morris,* Del.Supr., 610 A.2d 1354, 1360 (1992); *Gooden v. Mitchell,* Del.Super., 21 A.2d 197, 201 (1941). Upon remand, the Superior Court should instruct the jury to decide the question of whether Reid was Townsends' servant or an independent contractor, by specifically considering the non-exclusive "matters of fact" set forth in Section 220 of the *Restatement (Second) of Agency. See White v. Gulf Oil Corp.,* 406 A.2d at 51; *Billops v. Magness Constr. Co.,* Del.Supr., 391 A.2d 196, 198 (1978).

### Independent Contractors
### Agents and Non–Agents

The jury must first determine if Reid was Townsends' servant or an independent contractor. A determination that Reid is an independent contractor is not dispositive *per se* on the issue of Townsends' vicarious liability. The jury must then determine whether Reid is an agent-independent contractor or a non-agent independent contractor. *See American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,* 3d Cir., 42 F.3d 1421, 1436 (1994).

▆▆▆▆ The terms agent and independent contractor are not always mutually exclusive.

*Bradbury v. Phillips Petroleum Co.,* 10th Cir., 815 F.2d 1356, 1360 (1987); *see Weiss v. Security Storage Co.,* Del.Super., 272 A.2d 111, 114 (1970), *aff'd,* Del.Supr., 280 A.2d 534 (1971). Although a person cannot be a servant and an independent contractor, a person can be an independent contractor and an agent. *Johnson v. Bechtel Assocs. Prof'l Corp.,* D.D.C., 545 F.Supp. 783, 785 (1982), *aff'd in part, rev'd in part on other grounds,* D.C.Cir., 717 F.2d 574 (1983); *see In re United States,* 3d Cir., 367 F.2d 505, 509 (1966); RESTATEMENT (SECOND) OF AGENCY § 14N (1958). Consequently, in determining vicarious liability, the dispositive issue becomes whether the tortfeasor was an agent-independent contractor or a non-agent independent contractor. *See American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,* 42 F.3d at 1436; *see also Cheney v. Hailey,* Colo.Ct.App., 686 P.2d 808, 811 (1984).

█ One well-recognized exception to the general rule of non-agent status for an independent contractor turns on the "amount of control retained or exercised by the owner."[8] *See E.I. DuPont De Nemours & Co. v. Griffith,* Del.Supr., 130 A.2d 783, 784 (1957); *see also Stoll v. Noel,* 694 So.2d 701 (1997); MEECHEM ON AGENCY § 40 (2d ed.1914). If the owner's or contractee's control or direction dominates the manner or means of the work performed, the non-agent status of the independent contractor can be destroyed and the independent contractor becomes an agent capable of rendering the principal vicariously liable for the acts of the independent contractor. *See E.I. DuPont De Nemours & Co. v. Griffith,* 130 A.2d at 785; *see also Seeney v. Dover Country Club Apartments, Inc.,* Del.Super., 318 A.2d 619, 621 (1974). This determination is "almost entirely one of fact." *E.I. DuPont De Nemours &*

*Co. v. Griffith,* 130 A.2d at 785; *see Gooden v. Mitchell,* Del.Super., 21 A.2d 197, 201 (1941).

█ "It is well settled that questions of agency are not subject to absolute rules but, rather, turn on the facts of the individual case." *Sussex County v. Morris,* Del.Supr., 610 A.2d 1354, 1360 (1992). If the jury finds that Reid was not a servant, the determination of Reid's status as an agent or non-agent independent contractor is then critical to the issue of Townsends' vicarious liability. Where the determination of whether a worker was an agent or a non-agent independent contractor is critical to the disposition of the case and is dependent upon a reconciliation of the facts, summary judgment must be denied. *See Morris v. Blake,* Del.Super., 552 A.2d 844, 849 (1988) (citing *Schagrin v. Wilmington Med. Ctr., Inc.,* Del.Super., 304 A.2d 61 (1973)), *aff'd sub nom. Sussex County v. Morris,* Del.Supr., 610 A.2d 1354 (1992).

### Conclusion

The determination of whether an agency relationship exists is normally a question of fact. *Gooden v. Mitchell,* Del.Super., 21 A.2d 197, 201 (1941); *see Billops v. Magness Constr. Co.,* Del.Supr., 391 A.2d 196, 198 (1978); *Mechell v. Palmer,* Del.Supr., 343 A.2d 620, 621–22 (1975). Viewing the facts in the light most favorable to Fisher as the non-moving party, a factfinder could reasonably conclude that Reid was Townsends' agent, i.e., either a servant or agent-independent contractor. Those issues should be submitted to the jury with special interrogatories.

If the jury finds that Reid was Townsends' servant, an agency relationship is established. The relevant factual inquiry into the existence of a principal/agent relationship will not end *per se* if the jury determines that Reid was an independent contractor. If the jury finds that Reid was an independent contractor, it must then determine whether

---

8. One legal scholar has predicted that eventually the multitude of exceptions will reverse what is now the general rule that contractees are not liable for the negligence of independent contractors. Clarence Morris, *The Torts of an Indepen-* *dent Contractor,* 29 ILL.L.REV. 339 (1935) (suggesting that principals should be liable to third parties for the torts of independent contractors hired in connection with the business of the principal).

Reid was Townsends' agent or a non-agent independent contractor.

The summary judgment entered in Townsends' favor, on the issue of its vicarious liability to Fisher for Reid's negligent conduct, is reversed.