# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

GEORGE ACREE,      :
           :
           :     C.A. No. K21C-02-029-JJC
       Plaintiff,     :
           :
     v.        :
           :
BAYHEALTH MEDICAL CENTER,   :
INC., WEATHERBY LOCUMS,     :
INC., AND PREMIER        :
ORTHOPEDIC BONE AND JOINT   :
CARE, LLC,           :
           :
       Defendants.     :

Submitted:  December 19, 2022
Decided:     March 29, 2023

## MEMORDANDUM  OPINION AND ORDER

*Upon Defendant Weatherby Locums, Inc.'s Motion for Summary Judgment –*
**DENIED**

Ronald G. Poliquin, Esquire, THE POLIQUIN FIRM LLC., Dover, Delaware, *Attorney for Plaintiff.*

James E. Drnec, Esquire, and Phillip M. Casale, Esquire, WHARTON LEVIN EHRMANTRAUT & KLEIN, Wilmington, Delaware, *Attorneys for Defendant Bayhealth Medical Center, Inc.*

John A. Elzufon, Esquire, and Matthew Donelson, Esquire, ELZUFON, AUSTIN & MONDELL, P.A., Wilmington, Delaware, *Attorneys for Defendant Premier Orthopedic Bone and Joint Care, LLC.*

Maria R. Granaudo Gesty, Esquire, BURNS WHITE LLC., Wilmington, Delaware, *Attorney for Defendant Weatherby Locum, Inc.*

**Clark, R. J.**

Defendant Weatherby Locums, Inc. ("Weatherby") is a national staffing agency that recruits and places physicians with hospitals around the country. Here, Weatherby placed Dr. Thomas Anderson, an orthopedic surgeon, with Defendant Bayhealth Medical Center, Inc. ("Bayhealth") at its Kent General site in Dover.

Dr. Anderson then operated arthroscopically on Mr. Acree's knee at Kent General and Mr. Acree alleges that he did so negligently. Mr. Acree, however, did not sue Dr. Anderson individually. Rather, he sues Weatherby vicariously to recover for Dr. Anderson's alleged negligence.

This opinion addresses Weatherby's motion for summary judgment. In Weatherby's motion, it contends that it cannot be held liable under the doctrine of *respondeat superior* because Dr. Anderson performed the surgery as an independent contractor as a matter of law. Mr. Acree counters that Dr. Anderson's status for purposes of *respondeat superior* should remain a factual issue for the jury.

For the reasons discussed below, there are sufficient facts in the summary judgment record to preclude summary judgment. As a result, Dr. Anderson's master/servant versus independent contractor status will remain an issue for the jury.

## I.    BACKGROUND

Dr. Thomas Anderson performed a right knee arthroscopy on Mr. Acree at Bayhealth's Kent General site. After the surgery, Mr. Acree suffered complications and a post-operative infection that he alleges, in turn, will require him to undergo a total knee replacement.

Mr. Acree elected not to sue Dr. Anderson or any other alleged individual tortfeasors. Rather, he sues Bayhealth, Weatherby, and Premier Orthopedic Bone and Joint Care, LLC, and alleges they are vicariously liable for the harm that their employees caused him. Weatherby counters by contending that Dr. Anderson provided medical care to Mr. Acree as an independent contractor.

2

Weatherby placed Dr. Anderson with Bayhealth as a *locum tenens* physician. It selected this Latin phrase to describe the role of the doctors that it places – it means " to hold the place of" or to substitute for.[1] Since 2012, Weatherby has provided Bayhealth with multiple *locum tenens* physicians to help staff its facilities.[2]

Weatherby first moved for summary judgment early in the case before the parties completed discovery.[3] At that point, it relied primarily on the terms of two contracts: a written agreement between it and Dr. Anderson, and a separate written agreement between it and Bayhealth.[4] In Mr. Acree's initial opposition, he relied on (1) the general rule that issues of agency status are generally ones of fact, and (2) that he had not yet completed discovery on the issue.[5]

The Court then deferred its decision on the motion and provided the parties time to conduct limited discovery regarding Dr. Anderson's status. At that point, the Court left it to the parties to determine whether targeted discovery on the issue or broader discovery (to avoid potential duplication of efforts and costs) would be appropriate. The parties elected targeted discovery that they believed would conclude within two months. By stipulation, the parties later requested the Court to extend the discovery and briefing deadlines, which the Court approved.

When the parties filed their supplemental briefing, neither addressed the Restatement (Second) of Agency §220 (hereafter "Section 220") factors. In *Fisher v. Townsend,*[6] the Delaware Supreme Court clarified that *respondeat superior* questions in Delaware turn on the application of these factors. Accordingly, at oral argument, the Court requested the parties to provide additional written argument (1) to address the

---

[1] *Locum Tenens*, Black's Law Dictionary (11th ed. 2019).
[2] Def.'s Mot. for Summ. J., Ex. C at 7 [hereinafter Bayhealth Service Agreement].
[3] Def.'s Mot. for Summ. J.
[4] *Id.* ¶ 21–24.
[5] Pl.'s Resp. Mot. for Summ. J. ¶ 34.
[6] 695 A.2d 53 (Del. 1997).

Section 220 factors, and (2) to provide mandatory or persuasive authority that examined the status of a professional placed in a facility or business by a professional staffing agency. The parties then filed supplemental arguments on December 19, 2022.

## II.    FACTS OF RECORD

The summary judgment record includes three deposition transcripts and two contracts. The contracts include one between Weatherby and Bayhealth, and a separate contract between Weatherby and Dr. Anderson. The facts below are drawn from these sources and are viewed in the light most favorable to Mr. Acree.

Weatherby operates a medical staffing agency located in Florida. It recruits and then places medical professionals at health care facilities nationally.[7] Weatherby's business practice is to contract separately with the doctors it places and the "client" health care facilities where it places them.[8]

In February 2012, Weatherby contracted with Bayhealth ("Bayhealth Service Agreement") to fill multiple physician vacancies at Bayhealth's facilities in Delaware.[9] The Bayhealth Service Agreement permits Bayhealth to specify the disciplines and durations of service that it needs Weatherby to fill.[10] After receiving Bayhealth's request, Weatherby locates and then matches a physician with the facility. Weatherby then agrees to furnish the physician to Bayhealth for the requested time,[11] and agrees to pay the physician's travel and housing costs for the duration of the arrangement.[12] The Bayhealth Service Agreement further requires Weatherby to pay doctors such as Dr. Anderson directly.[13] In addition, it characterizes the doctors as independent

---

[7] Def.'s Suppl. Arg., Ex. B at 8–9 [hereinafter Dr. Anderson Dep.].
[8] Def.'s Suppl. Arg., Ex. C at 20 [hereinafter Gregory Prine Dep.].
[9] Bayhealth Service Agreement at 7.
[10] *Id*. at 1.
[11] *Id*.
[12] *Id*. at 2.
[13] *Id*. at 1.

4

contractors.[14]    The agreement further recites Weatherby's refusal to assume responsibility for the doctors' clinical decisions during the placement,[15] while confirming Bayhealth's obligation to set the doctors' work schedules and provide the doctors' the equipment and supplies needed to practice medicine.[16]  Throughout the placements, Weatherby  nevertheless retains the exclusive right to alter the doctors' work location with Bayhealth.[17]   In other words, Bayhealth may not unilaterally move the doctors from one of its facilities to another.    Finally, the agreement requires Weatherby to provide the physicians' medical malpractice insurance.[18]

The second contract, the November 2016 agreement between Weatherby and Dr. Anderson ("Dr. Anderson's Contract"), contains terms and obligations that, when viewed individually, provide additional relevant facts.[19]  As in the Bayhealth Service Agreement, Dr. Anderson's Contract characterizes Dr. Anderson as Weatherby's independent contractor.[20]   To this end, Weatherby labels its role as one that *arranges medical coverage* by Dr. Anderson without maintaining an interest in his *medical services*.[21]  Dr. Anderson's Contract further provided that Dr. Anderson had a one-year, uninterrupted placement with Bayhealth.[22]   It also precluded Dr. Anderson from competing with Bayhealth or from accepting a position with Bayhealth during the term, or for two years thereafter.[23]   Dr. Anderson's contract also gave Weatherby the right to immediately cancel the contract, without notice, for several reasons,[24] such as Dr.

---

[14] *Id.*
[15] Bayhealth Service Agreement at 1.
[16] *Id.* at 2.
[17] *Id.*
[18] *Id.* at 1.
[19] Def.'s Mot. for Summ. J., Ex. B at 1 [hereinafter Dr. Anderson's Contract].
[20] *Id.* at 1.
[21] *Id.* at 2.
[22] *Id.* at 3.
[23] *Id.*
[24] *Id.*

Anderson's failure to meet the "highest professional and ethical standards" when performing services for Bayhealth.[25] Separately, Weatherby agreed to provide Dr. Anderson with professional liability insurance and Dr. Anderson agreed to cooperate with any necessary defense efforts.[26]

Furthermore, Dr. Anderson's Contract imposed the following additional duties and obligations on Dr. Anderson: (1) to maintain a current medical license;[27] (2) to render faithful and diligent medical services pursuant to the highest professional and ethical standards as well as accepted standards of care;[28] (3) to preserve patient records;[29] (4) to advise Weatherby of any disciplinary or quality assurance proceedings that involved him;[30] and (5) to submit to both a drug screening and background check.[31] Weatherby, and only Weatherby, reserved the right to terminate Dr. Anderson if he breached any duty or obligation owed under the contract.[32]

The remainder of the summary judgment record comes from three depositions. In the first deposition, Dr. Anderson first described his relationship with Bayhealth. He explained that he performed one continuous and exclusive assignment at Bayhealth after his arrival.[33] For his part, he considered Bayhealth's Chief of Staff to be his supervisor at the facility.[34] Dr. Anderson also described his relationship with Weatherby. Namely, throughout his placement, he worked with a Weatherby contact person who acted as his intermediary with Bayhealth.[35] He explained that if Bayhealth had problems with the

---

[25] Dr. Anderson's Contract at 1.
[26] *Id.* at 2
[27] *Id.* at 1.
[28] *Id.*
[29] *Id.*
[30] Dr. Anderson's Contract at 3.
[31] *Id.*
[32] *Id.*
[33] Dr. Anderson Dep. at 10.
[34] *Id.* at 13.
[35] *See* Dr. Anderson Dep. at 14 (describing his relationship with his contact person at Weatherby).

quality of his work, it would raise those issues with Weatherby, who in turn would notify him.[36] On average, Dr. Anderson spoke with his contact person at Weatherby every other week while at Bayhealth.[37] He further testified that although Weatherby had no control over how he performed surgeries,[38] Weatherby paid him directly after he recorded his hours in Weatherby's time portal.[39]

Second, Gregory Prine testified as Weatherby's Rule 30(b)(6) designee and described Weatherby's business model.[40] According to Mr. Prine, Weatherby balanced the preference of its physicians for placement against the medical facilities' needs. He further explained how Weatherby conducts a background check on a potential physician and confirm licensure status at the beginning of the process.[41] Once Weatherby places a physician under contract, it discusses available locations and positions with the doctor.[42] At that point, the doctor picks a desired location from the options.[43] Weatherby then informs the medical facility of the potential match and schedules an interview between the doctor and the facility. If there is a match, Weatherby then arranges the details of the physician's assignment.

Furthermore, according to Mr. Prine, once a physician arrives at the job, Weatherby maintains contact with the physician about quality of life issues only, such as living arrangements and the acceptability of the commute.[44] He maintained that Weatherby employees do not discuss or become involved in the substance of a

---

[36] *Id.* at 16.
[37] *Id.* at 14.
[38] *Id.* at 27.
[39] *Id.* at 16.
[40] Gregory Prine Dep. at 8.
[41] *Id.* at 16–17.
[42] *Id.* at 9.
[43] *Id.*
[44] *Id.* at 19.

physician's work.[45] Mr. Prine further confirmed that Weatherby considered the physicians to be independent contractors.[46] On balance, Weatherby considered itself a staffing agency, not a medical facility, and intends to provide no oversight regarding the quality of care that its *locum tenens* physicians provide.[47]

Bayhealth's Rule 30(b)(6) designee, Dennis Hallock, also provided deposition testimony. Contrary to Mr. Prine, Mr. Hallock testified that Weatherby remained involved in the tripartite relationship from the beginning of the physician's placement to the end.[48] Mr. Hallock confirmed that Bayhealth would communicate directly with Weatherby, rather than the physician, to discipline or address bad conduct of a doctor, unless it were an emergency issue.[49] In such non-emergency cases, Bayhealth would contact Weatherby's assigned "handler," and the "handler" would address the matter with the physician.[50] From Bayhealth's perspective, Weatherby supervised Dr. Anderson and only Weatherby could terminate the doctor, if need be.[51]

## III. THE PARTIES' CONTENTIONS

Weatherby contends that Dr. Anderson was an independent contractor as a matter of law. It focuses narrowly on its lack of control over Dr. Anderson's clinical decision making and surgical actions.[52] On one hand, Weatherby acknowledges that it exercised

---

[45] Notably, for purposes of summary judgment, Mr. Prine's and Mr. Hallock's deposition testimony conflict regarding Weatherby's degree of involvement in the physician's day-to-day operations at the facility. *See id.* (providing Weatherby merely conducts quality checks once the physician at the facility); *c.f.*, Def.'s Suppl. Arg., Ex. D at 14 [hereinafter Dennis Hallock Dep.] (stating that Weatherby is involved from beginning to end and maintains consistent contact with Bayhealth and the physician regarding a range of issues).
[46] Gregory Prine Dep. at 8.
[47] *Id.* at 9.
[48] Dennis Hallock Dep. at 14.
[49] *Id.* at 27.
[50] *Id.* at 14.
[51] *Id.* at 24, 28.
[52] Def.'s Suppl. Br.'g. at 1, 4, 5.

8

some control over non-clinical aspects of Dr. Anderson's work by paying him, retaining the right to hire or fire him, and coordinating the location of his work. On the other hand, Weatherby emphasizes that it did not control Dr. Anderson's independent judgment when he treated patients. Accordingly, it contends that it cannot be held vicariously liable for his alleged negligence.

Mr. Acree counters that the question of Dr. Anderson's status is a factual issue that a jury must decide because such questions are almost entirely issues of fact.[53] He further urges the Court to examine and apply the Section 220 factors because they require a broader inquiry than merely focusing on the right to control the granular delivery of medical services. While Mr. Acree concedes that Weatherby did not control Dr. Anderson's clinical actions, he maintains that Weatherby retained significant control over the time, manner, and method of his work. In support, he relies on the following facts of record: (1) Weatherby paid Dr. Anderson directly, by the time; (2) it provided him with medical malpractice insurance; (3) it handled his necessary travel and housing arrangements; (4) it contractually required him to maintain and perform his medical care in conformity with national medical standards; and (5) it prohibited him from providing medical services in any manner outside of his work for Weatherby by virtue of a non-compete clause. Those facts, he submits, preclude summary judgment.

## IV.   STANDARD

Summary judgment is appropriate if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.[54] When considering a summary judgment motion, the Court must view the evidence in the light most favorable to the

---

[53] Pl.'s Suppl. Br.'g. at 2.
[54] Super. Ct. R. 56(c); *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).

9

non-moving party.[55] The moving party bears the initial burden of proof.[56] However, if the movant meets this initial burden, the burden shifts to the non-moving party to demonstrate the existence of material issues of fact.[57] When the non-moving party responds, he or she must identify a material fact in dispute that is sufficient to withstand a motion for judgment as a matter of law and can further support the verdict of a rational jury.[58]

## V. ANALYSIS

The Court's summary judgment decision turns on whether Weatherby's lack of control over Dr. Anderson's clinical decisions makes Dr. Anderson an independent contractor as a matter of law. For the reasons discussed below, it does not because (1) the issue of agency status is predominantly one of fact, and (2) Delaware law does not narrowly limit the analysis to one of granular control.

### A. *Respondeat Superior* **Law in Delaware**

Mr. Acree raises a vicarious liability claim against Weatherby. Ultimately, if Weatherby and Dr. Anderson had a master/servant relationship, Weatherby will become vicariously liable for any harm that Dr. Anderson negligently caused Mr. Acree. On the other hand, if Dr. Anderson provided the medical care as an independent contractor, Weatherby will not face potential liability.

In Delaware agency law, the vicarious liability of a principal depends, in large part, upon the extent of the principal's right of control over the other.[59] A master/servant relationship exists if the principal assumes the right to control the time, manner and

---

[55] *Brzoska v. Olson*, 688 A.2d 1355, 1364 (Del. 1995).
[56] Super. Ct. Civ. R. 56(e); *Sizemore*, 405 A.2d at 680.
[57] *Sizemore*, 405 A.2d at 681 (citing *Hurtt v. Goleburn*, 330 A.2d 134 (Del. 1974)).
[58] *Lum v. Anderson*, 2004 WL 772074, at *2 (Del. Super. Mar. 10, 2004).
[59] *Fisher v. Townsends, Inc.*, 695 A.2d 53, 59 (Del. 1997).

method of executing the work, as distinguished from the right to require only certain results in conformity with the contract.[60]

Typically, whether an individual is a servant or an independent contractor depends on the unique facts of each case.[61] The label by which the parties designate themselves is relevant, but it is not dispositive under circumstances where the status potentially impacts a third-party's rights.[62] In other words, even though two parties may contractually define one as an independent contractor, the question of status remains almost entirely one of fact.[63] Accordingly, no single rule governs whether a given relationship should be considered a master/servant or independent contractor relationship.[64]

The Delaware Supreme Court expressly adopted the Section 220 factors as the test for determining this status.[65] Section 220 requires the Court, when considering a motion for summary judgment, and the trier of fact if appropriate, to consider the following:

> (a) the extent of control, which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skill required in the particular occupation; (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (f) the length of time for which the person is employed; (g) the method of payment, whether by the time or by the job; (h) whether or not the work is part of the regular business of the employer; (i) whether or not the parties believe they are creating the relation of master and servant; and (j) whether the principal is or is not in business.[66]

---

[60] *Id.* (citing *Gooden v. Mitchell*, 21 A.2d 197, 200–01 (Del. Super. 1941)).
[61] *Fisher*, 695 A.2d at 59.
[62] *Id.* at 60.
[63] *Id.* at 61 (quotation omitted).
[64] *Id.*
[65] *Id.* at 59.
[66] Restatement (Second) of Agency § 220 (1958).

Here, the three relevant parties testified, either individually or through Rule 30(b)(6) designees, that they considered Dr. Anderson to be Weatherby's independent contractor. Furthermore, the evidence points fairly to only one relevant conclusion – that Weatherby had no right to control Dr. Anderson's granular delivery of medical services. Nevertheless, as explained in the *Fisher* decision, the parties' labels and the right to control are only two components in a list of factors that must be balanced.[67] Accordingly, the right to such granular control is not dispositive.[68]

In addition to master/servant liability, the *Fisher* decision explained that an independent contractor can still be liable under *respondeat superior* if he or she acts as an agent-independent contractor.[69] In this alternative analysis, the Court must focus on the principal's control or direction of the other and determine if it dominates the manner or means of the work performed.[70] If so, the principal is vicariously liable for injuries caused by the negligence of an independent contractor.[71]

In this case, the alternative analysis for imposing vicarious liability is not at issue. Rather, it applies only in circumstances where the principal retains control over the delivery of the particular service at issue.[72] On this record, no facts could support a reasonable jury's finding that Weatherby controlled how Dr. Anderson performed his surgery. Accordingly, the Court will not further address agent-independent contractor status.[73]

---

[67] *Fisher*, 695 A.2d at 60.

[68] *Id*. at 59.

[69] *Id*. at 60.

[70] *Id*. at 61.

[71] *Id*.

[72] *See id*. (explaining that if the principal's control or direction dominates the work performed, then the independent contractor may become an agent that subjects the principal to vicarious liability).

[73] The parties' arguments address this alternative analysis only in passing. Accordingly, the Court does not couch its decision as one granting partial summary judgment in Weatherby's favor on this alternative means of imputing vicarious liability. The effect of this decision, nevertheless, will be to remove such issue from the case since the motion fairly encompassed it.

## B. Application of the Section 220 Factors

The Section 220 factors generally leave the issue of agency status as one of fact.[74] Namely, the comments to Section 220 recognize the general inappropriateness of deciding the issue on summary judgment.[75] They further recognize that "although . . . the right to control the physical conduct of the person giving service is important and in many situations is determinative, the [degree of control] needed to establish the relation of master and servant may be very attenuated."[76] Weatherby narrowly focuses only on what has been termed the "right to control test." The *Fisher* decision, however, rejected such a narrow focus.

When examining the record in its entirety, four of the Section 220 factors weigh strongly in favor of independent contractor status. Two fall more neutrally. Three weigh strongly in favor of master/servant status.

The first factor, extent of control, weighs in favor of independent contractor status.[77] Weatherby maintained significant general control over Dr. Anderson, through competition restriction provisions, and the right to hire and fire; nevertheless, it retained no control over the "details of the work."[78] While a jury should be able to weigh the degree of both general and granular control when making its decision, the first factor focuses primarily on the granular type – the actual delivery of services.[79] Here, Mr. Acree's claims against Weatherby involved Dr. Anderson's surgical actions and clinical

---

[74] *Id.*

[75] *See* Restatement (Second) of Agency § 220 cmt. c (explaining when the inference regarding the parties' relationship is unclear, the jury must determine status).

[76] *Id.* § 220 cmt. d.

[77] Restatement (Second) of Agency § 220(2)(a).

[78] Section 220 comment i provides the helpful illustration of a full-time cook that takes no input from the principal regarding recipes or preparation. In such a circumstance, based on the other Restatement 220 factors, the cook may be considered a servant even though the employer has absolutely no control over his or her cooking. *Id.* § 220 cmt. i.

[79] *Id.* § 220 cmt. d.

decision-making. Accordingly, the evidence of record tilts this factor significantly in favor of independent contractor status.

The second factor asks whether Dr. Anderson was engaged in a distinct occupation or business.[80] This factor weighs neutrally. On one hand, Weatherby delivers no medical services directly to a patient. On the other hand, Weatherby is in the sole business of delivering medical professionals, who in turn, deliver medical services to patients. Furthermore, Dr. Anderson's covenant not to compete against Bayhealth, and in part against Weatherby, supports a master/servant relationship.[81] A jury should be able to consider the nuances presented in this record before making its findings.

The third and fourth factors examine the kind of occupation and skill involved.[82] Here, the actions and omissions at issue were those of an orthopedic surgeon who provided a highly skilled service. Accordingly, both factors weigh in favor of independent contractor status.

The fifth factor asks who provides the instrumentalities of the work.[83] On balance, the evidence cuts neutrally on this factor because Dr. Anderson, Weatherby, and Bayhealth were in a tripartite relationship. In that relationship, Bayhealth provided the place of work and the tools for Dr. Anderson to perform surgery and follow-up care. Nevertheless, Bayhealth provided those tools and instrumentalities pursuant to the Bayhealth Service Agreement with Weatherby.[84] In other words, Weatherby contracted for Bayhealth to provide Dr. Anderson's tools and practice site. Separately, Weatherby

---

[80] *Id.* § 220(2)(b).

[81] *See Keller v. Missouri Baptist Hosp. of Sullivan*, 800 S.W.2d 35, 38 (Miss. Ct. App. 1990) (recognizing that a partial covenant not to compete in a contract between a physician and a hospital staffing corporation strongly supported the second factor). More aptly, such employment restrictions supported that the physician was not engaged in his own independent or distinct occupation or business. *Id.*

[82] *Id.* § 220(2)(c) & (d).

[83] *Id.* § 220(2)(e).

[84] Bayhealth Service Agreement at 2.

procured malpractice insurance for Dr. Anderson which the jury may also find to be an instrumentality of his job. Given such evidence, a reasonable trier of fact could find that the fifth factor weighs against a master/servant relationship because Weatherby did not own the facility and Weatherby did not provide surgical tools directly to Dr. Anderson. On the other hand, a reasonable jury could find in favor of a master/servant relationship because *Weatherby contracted* with Bayhealth to provide him tools and a work location. For these reasons, the fifth factor cuts neutrally.

The sixth factor, the length of time of employment, cuts strongly in favor of a master/servant relationship.[85] As the comments reflect, the length of employment is important and when the employment is short, the worker is less apt to subject himself or herself to control. Here, Dr. Anderson and Weatherby entered a one-year relationship where Dr. Anderson provided services for the same facility.[86] Moreover, Dr. Anderson's Contract (1) restricted his ability to compete against Bayhealth, and (2) barred him from independently accepting a relationship with Bayhealth for an additional two years after the one-year term.[87] Such an exclusive and long-term agreement, combined with an even longer restriction regarding future employment opportunities, cuts heavily in favor of master/servant status.

The seventh factor also cuts in favor of a master/servant relationship.[88] Namely, Weatherby paid Dr. Anderson, by time, for the hours he inputted into Weatherby's portal.[89] Even though Dr. Anderson was a highly skilled worker, Weatherby's payment of him by time makes it more likely that he was Weatherby's servant.

The eighth factor asks whether the work is part of the employer's regular business and in this case weighs in favor of master/servant status. Weatherby places only medical

---

[85] Restatement (Second) of Agency § 220(2)(f).
[86] Dr. Anderson's Contract at 4.
[87] *Id*. at 3.
[88] Restatement (Second) of Agency § 220(2)(g).
[89] Dr. Anderson Dep. at 16.

15

professionals with medical facilities. The alleged negligence centers on the actions and omissions of a medical provider. Accordingly, Weatherby's role is different from that of a general temporary staffing agency that is in the business of placing workers in multiple businesses types and specialties. The summary judgment record includes sufficient facts for this factor to weigh in favor of finding a master/servant relationship.

The ninth factor weighs in favor of independent contractor status.[90] Namely, the two most relevant parties, Dr. Anderson and Weatherby, considered Dr. Anderson an independent contractor.[91] While the parties' description of their relationship does not control,[92] it is nevertheless a relevant factor that weighs in favor of independent contractor status. In the end, this factor, when considered with the other evidence, may carry the day with the trier of fact – or it may not.

The tenth and final factor asks whether the principal is in business,[93] and the evidence balances in favor of master/servant status. As explained above, Weatherby is in the business of placing medical professionals such as Dr. Anderson for a fee. That Weatherby is "in business" provides an additional fact that the jury may consider. For summary judgment purposes, this factor favors master/servant status.

On balance, Weatherby's right to hire and fire Dr. Anderson, its payment of him by time, and a long-term exclusive employment relationship (with a two-year restriction on employment beyond that) could support a reasonable jury's finding that Dr. Anderson was Weatherby's servant. Furthermore, Bayhealth's Rule 30(b)(6) designee's testimony supports findings that (1) Weatherby makes employment and discipline-related corrections on its *locum tenens* physicians through a "handler," and (2) Weatherby contractually required Dr. Anderson to maintain medical records, cooperate

---

[90] *Id*. at § 220(2)(i).
[91] Dr. Anderson Dep. at 9; Gregory Prine Dep. at 8.
[92] *Fisher*, 695 A.2d at 60.
[93] *Id*. at § 220(2)(j).

16

in any medical malpractice defense, and maintain high professional standards. The totality of the evidence, when viewed in the light most favorable to Mr. Acree, makes summary judgment inappropriate.

## VI.    CONCLUSION

For the reasons discussed above, Defendant Weatherby's Motion for Summary Judgement is **DENIED**. The question regarding whether Dr. Anderson provided medical care while working as either Weatherby's servant or independent contractor will remain an issue for the jury.

**IT IS SO ORDERED.**

/s/ Jeffrey J Clark<br>
Resident Judge

*Via File & Serve Express*

17