# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MARC J. CENTRELLA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0876-NAC |
| | ) | |
| AVANTOR, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: June 18, 2024
Date Decided: July 1, 2024

Tiffany Geyer Lydon, Philip Trainer, Jr., ASHBY & GEDDES, P.A. Wilmington, Delaware; Lisa C. Solbakken, ARKIN SOLBAKKEN LLP, New York, New York; *Counsel for the Plaintiff.*

Steven L. Becton, II, David J. Margules, Jessica C. Watt, BALLARD SPAHR LLP, Wilmington, Delaware; *Counsel for the Defendant.*

**COOK, V.C.**

This is a post-trial advancement decision. A publicly traded holding company's bylaws extend mandatory advancement rights to the employees of its subsidiaries. Those employees are, by the express terms of the bylaws, "conclusively presumed" to be serving in that role at the company's request. After the company sued a former employee of one of its subsidiaries to enforce restrictive covenants and enjoin his use of confidential information obtained in providing services pursuant to a service agreement, the former employee brought suit for advancement.

The defendant corporation contests whether the plaintiff was employed by its subsidiary. The defendant contends that instead, it employed the plaintiff—notwithstanding the defendant's organizational role as a holding company with no payroll employees. By contrast, the subsidiary, among other things, paid the plaintiff's wages, controlled the plaintiff's compensation adjustments, and is identified as the plaintiff's employer on his Form W-2s, paystubs, tax returns, and a host of internal documents. The subsidiary was materially involved in hiring the plaintiff and also employed the plaintiff's two supervisors during the plaintiff's tenure. In nearly all respects, the subsidiary controlled the plaintiff's job performance. For his part, the plaintiff submitted expense reports and vacation requests to the subsidiary and identified himself as an employee of the subsidiary.

The weight of Delaware's operative decisional law on the issue of employment—which centers, as the defendant corporation argues, on an inquiry

1

over the right of control—compels me to conclude that the defendant's subsidiary employed the plaintiff. Accordingly, the plaintiff is entitled to advancement.

## I. FACTUAL BACKGROUND

The preponderance of the evidence supports the following findings of fact.[1]

### A. The Service Agreement

From December 2019 to August 2022, Plaintiff Marc J. Centrella worked for Defendant Avantor, Inc.'s subsidiary, VWR Management Services, LLC ("VM").[2] Avantor, Inc. is a public Delaware corporation headquartered in Pennsylvania.[3] It does not own the Avantor trademark or have any payroll employees of its own.[4] Instead, it is "the parent corporation of a multinational organization"[5] and functions as a holding company for dozens of subsidiaries.[6] VM is one such subsidiary.

Avantor, Inc. acquired VM in a November 2017 merger with VM's parent entity ("VWR Corp.") and has held all VM's equity since before Centrella began his

---

[1] Joint trial exhibits are cited as "J__," and trial testimony is cited as "TT___ ([Name])."

[2] As used herein, "Avantor, Inc." refers to Defendant. But "Avantor" refers to the global Avantor organization—inclusive of Avantor, Inc. and its subsidiaries.

[3] *Centrella v. Avantor, Inc.*, C.A. No. 2022-0876-NAC ("Dkt.") 93, Pretrial Stipulation ("Stip.") ¶ 1.

[4] *See* J154 ("Baker Dep.") at 7–8; J153 ("Thompson Dep.") at 35–37; TT130 (Thompson).

[5] Stip. ¶ 2.

[6] *See* J88 (Avantor Organization Chart Dated December 31, 2021); TT137 (Thompson), 200–03 (Baker).

2

employment.[7]  Following the merger, VWR Corp.'s "operations continue in the same manner but have been integrated into the Avantor corporate structure."[8]

Defendant also owns VM's sole member and manager, VWR International, LLC ("VI").[9]  VI is Avantor, Inc.'s "primary U.S. operating company," while VM is a "service company" that "provide[s] a certain set of services to V[I]."[10]  The services are set forth on "Exhibit A" to a 2011 service agreement that governs VI and VM's relationship (the "Service Agreement").[11]  Those services include "Corporate Human Resources[,] Finance & Accounting-[]Reporting[,] Financial Planning & Analysis[,] Internal Audit[,] . . . [and] Business Development Services[.]"[12]  Thus, "V[M] is 'staffed with personnel or has access to agents that have the required qualifications, skills, and care to provide' the services required by V[I], and subsequent to the 2017 Merger required by Avantor more broadly."[13]

The Service Agreement also pushes employment-related risks to VM.  It provides that VM "shall be responsible for compliance of all laws, statutes and

---

[7] Stip. ¶¶ 4–6.

[8] J142 ("Def's Interrogatories") at 20.

[9] Stip. ¶ 7; TT164 (Baker).

[10] TT164–65, 201 (Baker).

[11] TT166 (Baker); J2 ("Service Agreement"); Stip. ¶ 8.

[12] Service Agreement at 9.

[13] Def's Interrogatories at 20 (quoting Service Agreement).

regulations governing the remuneration and benefits in respect of all of its employees employed or engaged by [VM]."[14]

## B. Centrella's Employment

In December 2019, Centrella was hired to serve as Avantor's "sole Vice President of Corporate Strategy and Mergers and Acquisitions ('M&A')."[15] In this role, Centrella was responsible for helping Avantor, Inc.'s CEO and board of directors pursue targets for acquisition.[16] As an M&A professional, Centrella served VM by performing its "Business Development Services" obligations to VI, as set forth in Exhibit A to the Service Agreement.[17] Prior to joining VM, Centrella's job title was "Vice President Business Development and Strategy."[18]

"Initially, Centrella reported to [Avantor, Inc.'s] CFO [Thomas] Szlosek. Szlosek was responsible for several categories of services on Exhibit A of the Service Agreement including finance and accounting, financial planning and analysis and internal audits."[19]

---

[14] Service Agreement at 4.

[15] Stip. ¶ 9.

[16] *Id.* ¶ 13.

[17] Service Agreement at 2; TT18 (Centrella).

[18] J119 (Centrella's LinkedIn Page); *see also* J155 ("Centrella Dep.") at 14.

[19] Dkt. 108, Defendant's Amended Proposed Findings of Fact ("Def's FoF") ¶ 23 (citations omitted).

Later, Centrella began reporting to both Szlosek and Avantor, Inc.'s Executive Vice President ("EVP"), Biopharma Production—Ger Brophy.[20] For his part, Brophy had an employment agreement with VM.[21] The agreement was signed by VM and said VM is Brophy's employer in no uncertain terms.[22] It also provides that: "The following are the . . . terms of your employment with V[M], effective as of the date hereof, under which you will provide services to Avantor, Inc. and its various affiliates."[23]

Together, Brophy and Szlosek—two of the three individuals that interviewed Centrella during his hiring process—controlled Centrella's employment, provided him instructive feedback, adjusted his compensation, and conducted his year-end evaluations.[24] VM also paid both Szlosek and Brophy's wages and served broadly as their "Payroll Entity."[25]

---

[20] *See id.*; J9 (Offer Letter).

[21] J8 (Brophy's Employment Agreement).

[22] *Id.*; *see also* Baker Dep. at 61 ("Q. Mr. Brophy was an employee of V[M]; correct? A. Yes.").

[23] J8 at 1.

[24] *See* J60 (2020 PMP Year-End Review); J92 (2021 PMP Year-End Review); Centrella Dep. at 16, 53–54 (explaining that Szlosek, Brophy, and possibly "an HR representative" were involved in adjusting Centrella's compensation from year to year).

[25] Def's Interrogatories at 13; Stip. ¶ 16. VM also was Michael Stubblefield's payroll entity. Def's Interrogatories at 13. Stubblefield was Avantor, Inc.'s CEO and Centrella's third interviewer. *See id.*; Centrella Dep. at 16.

"V[M] is identified as Centrella's employer on his Form W-2s, tax returns, and paystubs."[26] Like Centrella's supervisors, VM processed and paid Centrella's wages.[27] Centrella submitted his expense reports—which characterize him as a VM employee—and his vacation requests to VM for approval.[28] Centrella received business expense reimbursements from VM and VI.[29] Centrella received equipment from VM.[30] And his cost center was attributed to VI.[31] VI or VM also provided Centrella a VWR company credit card.[32]

Centrella's employee benefits, although not provided by VM, were provided by another Avantor, Inc. subsidiary—Avantor Funding, Inc.—VM's "indirect parent."[33] But it is notable that Centrella's employee benefits documentation includes a section titled "Employment Information" with a subsection titled "structure."[34] It states: "Avantor :: V[M]."[35]

---

[26] Stip. ¶ 12. These documents also identify VM by its own unique tax identification number. *See* Baker Dep. at 9; J150; J88.

[27] Stip. ¶ 11.

[28] *See, e.g.*, J84 (Time Off Request Approval from VWR email address); J143–48 (Expense Reports); J87 (Past Due Email on Corporate Credit Card).

[29] Def's Interrogatories at 14; Baker Dep. at 53.

[30] Def's Interrogatories at 14.

[31] Stip. ¶ 17.

[32] Def's Interrogatories at 15; TT59–61 (Centrella), 156–57 (Baker).

[33] Def's Interrogatories at 13; J88; Baker Dep. at 51.

[34] J10 (Centrella Employment Benefits Documentation).

At trial, Avantor, Inc.'s senior manager for North America payroll, Kevin Thompson, stated that VM "is [Centrella's] payroll and tax company, you know, for employment purposes."[36] Thompson explained, VM—though not a "common paymaster"[37]—is identified as the employer on Centrella's W-2s, subject to a location and reporting-based test, so that Avantor, Inc. or its subsidiaries could take advantage of local tax benefits.[38] Thompson also explained that, with several exceptions, VM and VI administer the payroll for all of Avantor's employees located in the U.S. and Canada—including the employees of Avantor, Inc.'s subsidiaries and Avantor, Inc.'s executives and officers.[39] To that end, Avantor, Inc. is not a payroll employer (*i.e.*, it does not pay wages or appear as an employer on any Form W-2s).[40]

Avantor, Inc.'s General Counsel conceded that Centrella's payroll documents "indicate" he was employed by VM during his tenure at Avantor.[41] Avantor, Inc.'s Senior Vice President ("SVP") and Deputy General Counsel for Corporate Matters, Scott Baker, goes further. At his deposition, Baker stated that VM was

---

[35] *Id.*

[36] TT141 (Thompson).

[37] TT148 (Thompson).

[38] *See* TT135 (Thompson).

[39] *See* TT122, 125–26, 130 (Thompson).

[40] Thompson Dep. at 35–37; TT130 (Thompson).

[41] J126 ("Miller Dep.") at 39.

7

"[t]echnically" Centrella's employer and conceded that Avantor, Inc. was not Centrella's employer "in any respect."[42]

Centrella's own communications send mixed signals. On many occasions—including in sworn court filings and deal negotiation documents—Centrella represented to third parties that he was acting on Avantor, Inc.'s behalf or believed Avantor, Inc. was his employer.[43] But at other times, Centrella represented he was VM's employee. This includes clear, repeated representations on his federal tax returns.[44] And it includes a December 2020 email that Centrella sent to Martin Goldman.[45] Goldman holds multiple business degrees, has a keen attention to detail, and—like Centrella—reported directly to Szlosek.[46] So it is of note that Goldman held himself out as serving jointly in two roles at the same time—both as Avantor, Inc.'s "SVP-Global Treasury & Taxation" and as VI's "VP-Global Taxation."[47]

---

[42] Baker Dep. at 25, 44 ("Q. So [Avantor, Inc.] wasn't the entity that employed him in any respect, at least to the best of your knowledge? A. Correct.").

[43] *See, e.g.*, Stip. ¶ 14.

[44] Stip. ¶ 12; J62 (Centrella Tax Returns); TT8, 116 (Centrella).

[45] J58 ("Would it be possible for an employee like me that is employed by V[M] to get paid in a currency other than USD?").

[46] J137 (Goldman's LinkedIn Page); J4; TT100–01 (Centrella).

[47] J137.

Some of Centrella's communication systems also indicated he was employed by VM.[48]

Defendant highlights an offer letter and other documents using Avantor trademarked letterhead as being factually relevant.[49]  But, as noted, Avantor, Inc. does not own the Avantor trademark.  Nor did Centrella sign the offer letter—or, for that matter, any other onboarding document offered into evidence.[50]

## C.    Centrella's Resignation

Toward the end of July 2022, Centrella advised Avantor, Inc. that he was resigning to join Avantor, Inc.'s alleged competitor ("Waters").[51]

On July 28, 2022, to dissuade Centrella from joining Waters—Avantor, Inc.'s EVP and Chief Human Resources Officer, Meghan Henson, emailed Centrella a personal services agreement ("PSA") that, she asserted, Centrella "signed as part of [his] onboarding."[52]  But the unsigned PSA Henson sent provides repeatedly that Centrella "is employed by V[I]."[53]  At her deposition, Henson maintained that she

---

[48] *See, e.g.*, J41 (voicemail system email identifying Centrella's "Company" as "V[M]").

[49] *See* J9.

[50] *See id.*; J16; J61; J104.

[51] J110 (Complaint in Underlying Action) at 1; Stip. ¶ 19.

[52] J104; J156 ("Henson Dep.") at 12.

[53] J104.

"recall[ed] trying [her] best to send the appropriate documentation" and "ha[d] no reason" to believe that she sent Centrella the wrong document.[54]

Also on July 28, 2022, Avantor, Inc. "informed Centrella" of its view that joining Waters would breach his contractual non-compete obligations and that it "intended to vigorously enforce its purported rights."[55] Avantor, Inc. also "expressed concerns regarding the potential that Centrella would disclose Avantor's confidential information to Waters."[56]

Centrella's resignation was effective August 19, 2022.[57] On September 6, 2022, Centrella's counsel informed Avantor, Inc. that Centrella "expected to commence employment at Waters on or after September 21, 2022."[58]

## D. Litigation

On September 8, 2022, Avantor, Inc. filed a complaint against Centrella as a "corporate officer" to enforce restrictive covenants and enjoin his use of "confidential

---

[54] Henson Dep. at 31. To similar effect, Michael Bernstein emailed Centrella a copy of a PSA in January 2020 to sign and return. J16. This PSA differs from the one Henson sent and states that it is "between Avantor, Inc., on behalf of itself and its affiliates (collectively, 'Avantor') . . . and Marc Centrella ('Associate'), who is or will be employed." *Id.* It then refers to the "Associate's employment with Avantor" and includes a modification provision that is designed to address "[a]ny change of employer within Avantor (as defined above)." *Id.*

[55] Stip. ¶ 20; TT22–23 (Centrella).

[56] Stip. ¶ 20.

[57] *Id.* ¶¶ 19, 22.

[58] *Id.* ¶ 23.

information" (the "Underlying Action").[59]  On September 9, 2022, Centrella provided an undertaking and made a demand for advancement, which Avantor, Inc. rejected.[60]  Centrella answered, filed counterclaims, and filed the Complaint in this action for advancement under Avantor, Inc.'s bylaws (the "Bylaws").[61]  Waters withdrew its job offer, Avantor, Inc. voluntarily dismissed its claims without prejudice, and Centrella amended his counterclaims in the Underlying Action.[62]

On summary judgment, I rejected Centrella's first theory, that he was entitled to relief as an Avantor, Inc. officer.[63]  But I held trial on April 4, 2024, to evaluate his second theory.[64]  I heard post-trial oral argument on June 18, 2024.

## II.  LEGAL ANALYSIS

Under his second theory, Centrella seeks advancement and fees on fees under the Bylaws as a former-VM employee.

"General rules of contract interpretation apply when construing the provisions of a company's charter or bylaws."[65]

---

[59] *See* J110; Stip. ¶ 25.

[60] Stip. ¶ 33; J114 (Demand and Undertaking).

[61] Stip. ¶ 26.

[62] *Id.* ¶¶ 28–30.

[63] *See* Dkt. 31 ("December 2022 Ruling"); Dkt. 69 ("November 2023 Ruling").

[64] *See* Stip. ¶ 35.

[65] *Krauss v. 180 Life Scis. Corp.*, 2022 WL 665323, at *4 (Del. Ch. Mar. 7, 2022).

11

When interpreting a contract, the court's ultimate goal is to determine the parties' shared intent. Because Delaware adheres to the objective theory of contract interpretation, the court looks to the most objective indicia of that intent: the words found in the written instrument. As part of this initial review, the court ascribes to the words their "common or ordinary meaning," and interprets them as would an "objectively reasonable third-party observer." When the plain, common, and ordinary meaning of the words lends itself to only one reasonable interpretation, that interpretation controls the litigation.[66]

"Rights to indemnification and advancement are deeply rooted in the public policy of Delaware corporate law in that they are viewed less as an individual benefit arising from a person's employment and more as a desirable mechanism to manage risk in return for greater corporate benefits."[67] Indeed, "[a]dvancement is an especially important corollary to indemnification as an inducement for attracting capable individuals into corporate service."[68]

This exact policy was in full swing when Avantor, Inc. drafted the Bylaws.[69] To that end, the Bylaws' indemnification and advancement provisions "were drafted broadly" on "purpos[e]" and provide sweeping coverage—including to the employees of Avantor, Inc.'s subsidiaries.[70]

---

[66] *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008) (footnotes omitted). In addition to applying "contract interpretation" principles when interpreting bylaws, in the advancement "context, Delaware courts 'simultaneously apply the patina of section 145's policy.'" *Underbrink v. Warrior Energy Servs. Corp.*, 2008 WL 2262316, at *7 (Del. Ch. May 30, 2008).

[67] *Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 509 (Del. 2005).

[68] *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 211 (Del. 2005).

[69] TT205 (Baker).

[70] TT204 (Baker).

12

## A. Centrella Is Entitled To Mandatory Advancement Under The Bylaws

As I explain below, the Bylaws provide mandatory advancement rights to VM employees sued by reason of their employment. VM employed Centrella, and Avantor, Inc. sued Centrella by reason of his employment.

Section 7.02 of the Bylaws extends advancement to an "indemnitee."[71] The term "indemnitee" is defined in Section 7.01—which, for its part, extends indemnification rights to indemnitees "to the fullest extent permitted by Delaware law."[72] In relevant part, Section 7.01 defines Indemnitee as someone "who was or is made a party or is threatened to be made a party to or is otherwise involved in any" civil "action, suit or proceeding" by "reason of the fact that he or she . . . is or was *serving at the request* of [Avantor, Inc.] as a director, officer, *employee*, agent or trustee of another corporation or of a partnership, joint venture, trust or other enterprise . . . ."[73] The Bylaws also explain that "[a]ny person serving" as an "employee or agent" of a "limited liability company . . . at least 50% of whose equity interests are owned by [Avantor, Inc.] . . . shall be *conclusively presumed* to be serving in such capacity at the request of [Avantor, Inc.]."[74]

---

[71] J1 ("Bylaws") § 7.02.

[72] For clarity, I will capitalize "indemnitee" when referring to the term defined in Section 7.01 of the Bylaws.

[73] Bylaws § 7.01 (emphases added).

[74] *Id.* § 7.04(B) (emphasis added).

13

The Bylaws further provide that, "[t]o the fullest extent permitted by law, if successful in whole or in part," an Indemnitee is entitled to fees on fees in "any" suit to enforce his or her advancement right and, in such cases, "the burden of proving" the Indemnitee is not entitled advancement falls entirely on Avantor, Inc.[75]

Here, the parties do not dispute that Avantor, Inc. wholly owned VM or that VM employees are entitled to advancement.[76] Instead, they dispute whether (1) VM employed Centrella and (2) Avantor, Inc. sued Centrella "by reason of the fact" of his employment. Both issues are potentially dispositive of whether Centrella is an Indemnitee under the Bylaws.

I make two observations at the outset. First, the persons to whom the Bylaws provide advancement (*i.e.*, Indemnitees) are those to whom indemnification must be provided to "the fullest extent permitted by Delaware law." This demonstrably broad language makes its drafters' intentions clear and compels a similarly broad reading of the definition of Indemnitee, as that term is used in

---

[75] *Id.* § 7.03.

[76] Stip. ¶¶ 6–7. Defendant argues Centrella was not an employee of VM, but Defendant does not challenge or otherwise discuss the applicability of Section 7.01's "conclusive[] presum[ption]" to this action. Even if Defendant had successfully challenged whether its ownership of VM was of the nature giving rise to the "conclusive[] presum[ption]" in Section 7.01, the inquiry would shift to whether Centrella was employed by VM at Avantor, Inc.'s request. But, given Avantor, Inc.'s structure—a holding company with no payroll employees—and its intention to provide paradigmatically broad advancement rights (discussed below), Defendant would be hard pressed to show that, if Centrella was employed by one of its subsidiaries, he did not serve in that role at Defendant's request.

14

Section 7.01.[77]  This, in turn, requires the Court to interpret the word "employee," as used in defining Indemnitee, in a correspondingly broad manner.  Compounding this conclusion is the notion that "[c]orporations do not typically extend mandatory advancement rights to employees and agents, instead reserving such rights for directors and officers appointed by the directors."[78]  Yet, here, although not required by Delaware law, the Bylaws' drafters went out of their way to do just that.

Second, and building on the first observation, the Bylaws do not condition the "conclusiv[e] presum[ption]" on an individual being employed *exclusively* by an Avantor, Inc. subsidiary.  Instead, by its plain terms, the Bylaws extend

---

[77] *See Sun-Times Media Grp., Inc. v. Black*, 954 A.2d 380, 394–95 (Del. Ch. 2008) ("[T]he meaning of the Advancement Provision becomes evident, especially given that the Provision is to be interpreted broadly, per the mandate of the Certificate provision expressing an intention to provide directors and officers with advancement and indemnification 'to the fullest extent permitted by applicable law.'").  Even aside from the "to the fullest extent" language in Section 7.01, the Bylaws contain other clear markers showing Avantor, Inc. intended both the indemnification and advancement provisions to be interpreted broadly.  Indeed, another way to communicate "to the fullest extent under the law" would be simply to copy relevant portions of the indemnification and advancement statute into the Bylaws, but change the statute's permissive language to be mandatory.  The drafters of the Bylaws seem largely to have adopted this approach, with limited deviations from the statutory text further reflecting the drafters' intent to confer extraordinarily broad rights.  *See, e.g.*, Bylaws § 7.01 (expressly contemplating "compulsory counterclaims" against Avantor, Inc. notwithstanding absence of such text in 8 *Del. C.* § 145); *id.* § 7.02 (expressly contemplating advancement associated with "*appearing at, participating in or* defending" a proceeding (emphasis added)); *see also* TT205 (Baker) ("[W]e think about [the indemnification and advancement provisions in the Bylaws] broadly because we ask our -- certain of our associates to fill officer and director roles, and that has different meanings . . . in different jurisdictions around the world, and so we wanted to ensure -- when we thought about drafting this broadly, we wanted to ensure that if we're asking an associate in a foreign jurisdiction to become a director of that entity, that that individual would have the benefit of . . . that indemnification provision.").

[78] *Sassano*, 948 A.2d at 460.

15

advancement to persons who may have been employed by an Avantor, Inc. subsidiary in addition to another entity, such as, for example, Avantor, Inc.

### 1. VM Employed Centrella

Defendant argues strenuously that payroll is ministerial and not dispositive of the employment relationship, and thus, the Court should reject the technical meaning of "employee" in favor of the functional test—focused on an employer's right of control.

At bottom, this is an interpretation question. I must determine whether Centrella was VM's "employee" and thus an "[I]ndemnitee," as those terms are used in the Bylaws. In doing so, as I noted above, I must construe these terms broadly to give effect to the clear intention indicated in the Bylaws' express, sweeping terms.

As Defendant argues, "[t]his Court often looks to dictionaries to ascertain a term's plain meaning."[79]

Black's Law Dictionary defines "employee" as "[s]omeone who works in the service of another under an express or implied contract of hire, under which the employer has the *right to control* the details of work performance."[80]

---

[79] *Chordia v. Lee*, 2024 WL 49850, at \*25 (Del. Ch. Jan. 4, 2024); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract. This is because dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract." (footnote omitted)).

[80] *Employee*, Black's Law Dictionary (11th ed. 2019) (emphasis added).

The Restatement (Second) of Agency defines "servant" (which is "synonymous" with "employee") as "a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's *control or right to control*."[81]

These definitions suggest the operative question arises from the right to control. Indeed, our high court has explained that "[f]rom the existence of the right to control springs the employer-employee relationship."[82]

I make no effort to provide a comprehensive definition for employment relationships. As the Restatement (Second) of Agency has noted, "[t]he relation of master and servant is one not capable of exact definition."[83] In part for this reason, "[t]he definition of *employee* [is] a term that has 'probably produced more reported cases than any definition of status in the modern history of law . . . .'"[84] Indeed, the highly fact-intensive nature of the employment inquiry coupled with the lack of

---

[81] Restatement (Second) of Agency [hereinafter "Restatement"] § 220(1), cmt. g (Am. L. Inst. 1958) (emphasis added); *accord Falconi v. Coombs & Coombs, Inc.*, 902 A.2d 1094, 1099 n.16 (Del. 2006); *see also Fisher v. Townsends, Inc.*, 695 A.2d 53, 58 (Del. 1997) ("Because all employers are masters and all employees are servants, the terms employer/employee are often used interchangeably to denote a master/servant relationship.").

[82] *Lester C. Newton Trucking Co. v. Neal*, 204 A.2d 393, 395 (Del. 1964).

[83] Restatement § 220 cmt. c.

[84] *Falconi*, 902 A.2d at 1099 n.16 (citation omitted).

17

clear definition surrounding its parameters is, at least in part, what initially gave rise to the need for a trial in this action.[85]

Nonetheless, Defendant argues that the right of control is the central issue here. And the definitional meaning of "employee" seems generally to support that interpretation of the Bylaws. "But dictionary definitions are not the only possible source of plain meaning. . . . In addition to relying on dictionary definitions, a court may look to how a term or phrase is used in a particular legal context."[86] As that relates here, our courts have found the right of control to remain a central inquiry to employment determinations in a host of varying legal contexts.

In significant part, our courts look to the test Defendant highlights—the "functional" *Lester C. Newton* test. Although born out of workers' compensation case law, the *Newton* test has since been applied in a diverse array of other legal contexts.

At the outset, it seems at least relevant to consider the factors weighed in the workers' compensation context when determining the meaning of "employee" and whether an employer-employee relationship existed since "[t]he appellations

---

[85] *See Miller v. Preston Trucking*, 1998 WL 733191, at \*3 (Del. Super. June 11, 1998) ("The facts and circumstances of each case determine whether an employer-employee relationship exists . . . ."); *Morris v. Blake*, 552 A.2d 844, 849 (Del. Super. 1988) ("Summary judgment will be denied where the agency question is critical to the disposition of the case and where further exploration of the facts is appropriate."), *aff'd*, 610 A.2d 1354 (Del. 1992); *Patterson v. Blue Hen Lines*, 1986 WL 2274, at \*2 (Del. Super. Jan. 28, 1986) ("The determination of an employer-employee relationship almost always is a question of fact.").

[86] *In re P3 Health Grp. Hldgs., LLC*, 282 A.3d 1054, 1066–67 (Del. Ch. 2022).

18

employer and employee . . . are used most frequently in determining workers' compensation rights or obligations. Accordingly, the words employer and employee have become imbued with the connotations that arise from the implications of that direct relationship pursuant to the workers' compensation statute."[87]

In the *Newton* test, our courts consider four questions: "who hired the worker, had the power to discharge him, paid his wages, and was in control of the worker's activities while he was working."[88] But the most weight is given to the right to control.[89] "The test being the right to control, it makes little difference whether or not that right has actually been exercised."[90] In the workers' compensation context, the *Newton* test is used to determine "which one of two potential employers can be considered as the employer . . . ."[91] But as noted, this test and variations of it have been used in other contexts.

For example, one court has applied the *Newton* test when interpreting the meaning of the word "employment" in a contract.[92] The court reasoned that "[t]here

---

[87] *Fisher*, 695 A.2d at 58 (citations omitted).

[88] *Porter v. Pathfinder Servs., Inc.*, 683 A.2d 40, 42 (Del. 1996) (citations omitted).

[89] *Id.*

[90] *Newton*, 204 A.2d at 395.

[91] *Harleysville Mut. Ins. Co. v. Five Points Fire Co. No. 1*, 444 A.2d 304, 307 (Del. Super. 1982).

[92] *Haft v. Dart Grp. Corp.*, 841 F. Supp. 549, 565–66 (D. Del. 1993) (applying Delaware law).

is no indication" that "a standard containing different elements governs the contractual side of the employment relationship."[93]

Another decision used the *Newton* test when interpreting the meaning of the word "employee" in an insurance contract. In doing so, the Delaware Superior Court examined the meaning of "employee" in the workers' compensation context as part of its analysis for determining how the contract interpretation issue should be treated.[94] The court concluded, after considering the factors in the *Newton* test, that the disputed individuals "are not employees within any acceptable common law definition."[95]

In similar fashion, several other decisions seem to focus on the *Newton* test as providing the relevant inquiry under a common law assessment of employment. Our high court explained in one such decision that "[s]ince most compensation acts contain no definition of the term 'employee' . . . it has generally been taken for granted that the common-law definition of employee, or servant, worked out for vicarious tort liability purposes, was meant to be adopted."[96] This common law definition "usually consists largely of a listing of relevant characteristics or tests,

---

[93] *Id.* at 565 n.14.

[94] *Harleysville*, 444 A.2d at 307.

[95] *Id.*

[96] *White v. Gulf Oil Corp.*, 406 A.2d 48, 51 (Del. 1979) (quoting 1B Larson, *Workmen's Compensation Law*, § 43.10 (1979) and later citing *Newton*, 204 A.2d at 395 for the proposition that "the predominant consideration in determining an employment relationship is that of right to control").

coupled with the warning that all except the control test are merely indicia pointing one way or the other."[97] And still other cases appear to view the *Newton* test as synonymous with the common law test.[98]

I take note of these varying uses of the *Newton* test to highlight the significant emphasis our courts place on the right of control across the board when they are called upon to make employment determinations. Indeed, even in the handful of outlier contexts, where the *Newton* test may not so readily apply, primary weight remains on the right of control. For example, when determining whether a person is an employee or an independent contractor, our high court has instructed that trial courts are to consider the factors set forth in the Restatement (Second) of Agency § 220.[99] But even when considering those factors, our courts have recognized that "[t]he primary issue is whether or not the Employer retained control . . . ."[100] And in the personal injury context, our courts have also stated that

---

[97] *Id.*

[98] *See Barnard v. State*, 642 A.2d 808 (Del. Super. 1992), *aff'd*, 637 A.2d 829 (Del. 1994).

[99] *Falconi*, 902 A.2d at 1099–1100.

[100] *Preston Trucking*, 1998 WL 733191, at *4; *id* at *3 ("Although all of the factors in § 220(2) must be considered in making the employee/independent contractor determination, the one given predominant consideration is the right to control the details of the work."). The Delaware Supreme Court has made this point explicit. Although considering other factors set forth in the Restatement, whether "agents are characterized either as servants or independent contractors" depends "upon the right of control capable of being exercised by the principal . . . ." *Fisher*, 695 A.2d at 59. If, for example, "the principal assumes the right to control the time, manner and method of executing the work, as distinguished from the right merely to require certain definite results in conformity to the contract, a master/servant type of agency relationship has been created." *Id.*

21

"agency is a question of fact in each case, with the central inquiry being whether the right to control is present, without regard to whether such control is actually exercised or not."[101]

Initially, I was reticent to apply the *Newton* test out-right since, as noted in *Harleysville Mutual Insurance Co. v. Five Points Fire Co. No. 1*, it has been predominately applied to instances where one must determine which of two entities employed a person in the workers' compensation context.[102] By contrast, here, I am asked to resolve a different question—whether VM employed Centrella. I am not asked to decide as between Avantor, Inc. and VM or to determine whether Avantor, Inc. employed Centrella at all.[103]

---

[101] *Blake*, 552 A.2d at 849.

[102] 444 A.2d at 307.

[103] Separately, I note that, to the extent Defendant seeks to usher in workers' compensation law as applicable to this context, it cannot escape the further possibility under that case law that Avantor, Inc. and VM may have both employed Centrella as "intertwined" parent and subsidiary entities. Indeed, workers' compensation law recognizes express instances of "joint employment"—which are "fairly common." *A. Mazzetti & Sons, Inc. v. Ruffin*, 437 A.2d 1120, 1123 (Del. 1981) (quoting 1C Larson, *Workmen's Compensation Law*, § 48.40 (1980)). For joint employment, our courts look to three elements—whether the same employee (1) is "under the simultaneous control of both employers; and (2) performs services simultaneously for both employers; and (3) the services performed for each are the same or closely related." *Id.* Again, the right to control occupies a dominant place in this assessment. Notably, "[t]he decisive factor leading to a joint employment holding may," among other things, be: "that the activities of the two companies (parent and subsidiary) were 'intertwined' and the injured employee was on the payroll of both;" or "that both companies controlled to a degree the details of the employee's work that resulted in his injury." *Id.* at 1126. Moreover, opposite Defendant's general contention that payroll is "ministerial," our case law shows that, at least when considering the issue of joint employment, payroll may be relevant in determining who a person's employer is. *See id.*

22

Nonetheless, I find the *Newton* test's seemingly broad use by Delaware courts in a host of varying contexts to be a compelling testament of its versatility and general appropriateness for assessing the issue of employment. It certainly corroborates the definitional meaning of "employee" in its focus on the right of control. I thus view the *Newton* test's factors, at least in part, as instructive of the pertinent issues surrounding an employment determination.

Given the foregoing, the plain, broad meaning of "employee," as used in the Bylaws and considered for its definition and use across a wealth of decisional law in varying contexts, centers primarily on the right of control. Accordingly, I agree with the central thrust of Defendant's argument as to the appropriate law. But I disagree with Defendant's application and conclusion.

For his part, Centrella does not meaningfully contest Defendant's use of a "control" test.[104] Instead, Centrella argues that even viewed under that test, VM employed him. I agree.

The facts here compel me to conclude that VM controlled Centrella and was his employer. By contract, VM provided services to VI. To that end, VM was "'staffed with personnel . . . that have the required qualifications, skills, and care to provide' the services required by V[I]" and "Avantor more broadly."[105] This included, then, staffing VM with employees necessary to provide "Business

---

[104] Dkt. 109, Plaintiff's Post-Trial Reply Br. ("Pl's RB") at 9–10.

[105] Def's Interrogatories at 20 (quoting Service Agreement).

Development Services" to VI for VI and Avantor's benefit.[106]   Centrella was one such employee.

VM dominated Centrella's hiring process.[107]   After which, Centrella left his previous employer, Repligen Corporation, where he was employed as its "Vice President Business Development and Strategy."[108]   As a skilled VM employee, Centrella provided "Business Development Services" to VI under the Service Agreement for VI and Avantor's benefit.   In doing so, Centrella reported to, and his employment was principally controlled by, other VM employees—who, like him, provided services for VI and Avantor's benefit.

VM employed at least two of the three individuals that interviewed Centrella during his hiring.   Although not a common paymaster, VM paid Centrella's salary

---

[106] *Compare id.*, *with* Service Agreement at 9.

[107] VM employed at least two of the three individuals that interviewed Centrella during the hiring process—Brophy and Szlosek—and VM served as the payroll entity for the third interviewer.   Defendant's own proposed findings of fact provide that Szlosek "was responsible for several categories of services on Exhibit A of the Service Agreement . . . ." Def's FoF ¶ 23.   But, under the Service Agreement, VM is the entity obligated to provide the services set forth on Exhibit A.   *See* Service Agreement.   As the one "responsible" for those services, it follows that Szlosek was a VM employee or agent.   Likewise, Brophy's employment agreement, bearing a signature by a VM representative, is clear that he was a VM employee.   J8.   As such, he was to "provide services to Avantor, Inc. and its various affiliates."   *Id.*   And, lest there be any remaining question over whether VM employed Brophy, I note that Baker—Avantor, Inc.'s Deputy General Counsel for Corporate Matters—expressly agreed that VM employed Brophy.   Baker Dep. at 61 ("Q. Mr. Brophy was an employee of V[M]; correct?   A. Yes.").   And the parties agree that VM paid both Brophy and Szlosek's wages.   Stip. ¶ 16.

[108] J119.   What better way for VM to satisfy its contractual obligation to maintain appropriate staffing than to hire someone whose prior job title literally includes the name of the service he is being hired to provide?

and appears on all of Centrella's tax and payroll documents as his employer. VM reimbursed Centrella for business expenses, provided Centrella with equipment,[109] and appears as his employer on a host of other internal documents—including expense reports and his employee benefits documentation.

As noted, Centrella reported directly to VM employees—Brophy and Szlosek—who monitored and controlled almost every aspect of his work, employment, and compensation adjustments and who conducted his year-end evaluations.

Accordingly, and construing the plain meaning of the Bylaws' use of the term "employee" broadly as intended, I conclude that Centrella was a VM "employee." Indeed, whether it was his burden or not, Centrella has presented evidence making this unequivocally clear. Frankly, it does not matter whether I use a functional or technical test here since, under either test, the evidence in this case would compel me to conclude that VM employed Centrella. The preponderance of the evidence shows VM hired Centrella, paid Centrella, and had the right to control his job performance.[110] This is enough to find that, even under Defendant's proposed use of the "functional" *Newton* test, Centrella was VM's employee.

---

[109] *Cf. Wahl v. NACCO Materials Handling Grp., Inc.*, 1996 WL 769770, at *1 (Del. Super. Nov. 6, 1996) ("Where the employer furnishes valuable equipment for use by the employee in the activity in question, the relationship is invariably that of an employer-employee.").

[110] Neither party has presented clear evidence of whether VM had the right to terminate Centrella. Given the foregoing, it seems likely VM had that right, but I need not

Defendant argues Avantor, Inc. employed Centrella or Centrella is estopped from denying he was employed by Avantor, Inc. because (1) he provided services that benefited the broader Avantor organization, not just VM or VI,[111] (2) he reported to Szlosek and Brophy, (3) at his deposition, he did not know what services VM provided to VI, (4) he subjectively believed he was employed by Avantor, Inc., and (5) he represented in court filings that he was employed by Avantor, Inc. and should be barred from denying his "judicial admissions"[112] to that effect.

---

reach that conclusion given the strength of the other considerations showing that VM employed Centrella.

[111] As noted above, Defendant's sworn interrogatory responses show its understanding that VM's relationship to VI is one designed to serve the broader Avantor organization—not just VI. That is, the interrogatory responses expressly augment the language of the Service Agreement to account for certain changes to VM's role as it relates to the Service Agreement and services it provides thereunder following the 2017 merger with VWR Corp. The interrogatories provide the following: "V[M]'s operations and services are outlined in the Service Agreement, which states that V[M] is 'staffed with personnel or has access to agents that have the required qualifications, skills, and care to provide' the services required by V[I], *and subsequent to the 2017 Merger required by Avantor more broadly*." Def's Interrogatories at 20 (emphasis added) (quoting Service Agreement).

[112] There seems to be some karmic irony housed in Avantor, Inc.'s attempts to enforce so-called judicial admissions, given Defendant's own assertion in the very first sentence of its complaint in the Underlying Action that Centrella was "a former high-level, experienced, corporate officer . . . ." J110. Indeed, had I determined—as Centrella argued at the time—that such a statement in a court filing was a judicial admission, there would be no question that Centrella is entitled to advancement under the Bylaws. *See* December 2022 Ruling at 18–21. I rejected Centrella's argument at the summary judgment stage because "[t]he judicial admissions doctrine 'does not apply to admitted legal conclusions.'" *Id.* at 19 (quoting *Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 766 (Del. 2022)). This extends to interpretation of unambiguous contract text as an issue of law. *Id.* at 19–20 (citing *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 847 n.68 (Del. 2019)). Although my prior ruling addressed the Bylaws' references to "officer," these principles, in turn, seem applicable here too. Indeed, Defendant specifically objected to one of Centrella's interrogatories on the basis that determining whether there is an "employer/employee relationship between Centrella and any Avantor subsidiary . . . is an issue of law." Def's Interrogatories at 7.

These arguments fail for a simple reason. And it is a painfully simple reason. They fail because whether Avantor, Inc. employed Centrella is not dispositive of whether VM also employed him. The paradigmatically broad language in the Bylaws extends advancement rights to VM employees made party to a proceeding by reason of their employment. Full stop. As Centrella notes, there is "no express or implied exception"[113] to this obligation, nor is it conditioned on a person being *exclusively* employed by an Avantor, Inc. subsidiary. This means that I need not decide which entity, as *between* Avantor, Inc. and VM, employed Centrella to determine whether he is a covered person under the Bylaws.[114] I need only decide if

---

[113] Pl's RB at 1.

[114] As an aside, framing the issue as between one entity or another assumes the non-existence of "fairly common" joint employment arrangements. *Ruffin*, 437 A.2d at 1123 (quoting 1C Larson, *Workmen's Compensation Law*, § 48.40 (1980)). But even if I were forced to decide this artificial question—as between Avantor, Inc. and VM—I would find that VM employed Centrella and Avantor, Inc. did not. Deciding as between Avantor, Inc. and VM is analogous to the context in which the *Newton* test is conventionally applied. But, as the foregoing makes clear, almost every factor in the *Newton* test points to VM as having employed Centrella. Moreover, when deciding as between two entities, if neither "can satisfy all of the" factors in the *Newton* test, then "the determinative factor of an employment relationship is 'who had the right to control . . . .'" *Wahl*, 1996 WL 769770, at *1. Here, I have already explained why VM satisfies at least three of the four factors in the *Newton* test—each to the presumptive exclusion of Avantor, Inc.'s involvement. And, as I concluded above, VM clearly had the right to control Centrella's job performance. By contrast, Avantor, Inc. has no payroll employees. Indeed, even its CEO is paid by VM. It is not clear whether Avantor, Inc. was involved in Centrella's hiring process or whether it had the right to terminate Centrella. And, to the extent Avantor, Inc. had any control over Centrella's job performance, it only held that control jointly with VM. Defendant contends that subjective belief is of particular relevance to the employment inquiry. It seems notable then, at least relative to the arguments Defendant advances, that its own Deputy General Counsel for Corporate Matters agreed under oath that Avantor, Inc. did not employ Centrella "in any respect." Baker Dep. at 44 ("Q. So [Avantor, Inc.] wasn't the entity that employed [Centrella] in any respect, at least to the best of your knowledge? A. Correct."). As for Centrella's subjective belief, his email to Goldman—who appears to have self-

27

VM employed Centrella—there is a difference. Thus, even if I accept each of Defendant's enumerated assertions as true, *so what?* The ultimate conclusion of those assertions—that Avantor, Inc. employed Centrella—is edentulous because it does not show Centrella was not employed by VM.[115] The overwhelming weight of evidence—and certainly the preponderance of the evidence—shows VM employed Centrella. And as a former VM employee, Centrella remains entitled to advancement under the Bylaws if sued by reason of that employment.

### 2. Avantor, Inc. Sued Centrella In His Official Capacity

"Under Delaware law, '[t]he "by reason of the fact" standard, or the "official capacity" standard, is interpreted broadly and in favor of indemnification and advancement.'"[116] "[I]f there is a nexus or causal connection between any of the underlying proceedings . . . and one's official corporate capacity, those proceedings are 'by reason of the fact' . . . without regard to one's motivation for engaging in that conduct."[117] "In advancement cases, the line between being sued in one's personal capacity and one's corporate capacity generally is drawn in favor of advancement

identified as a joint employee of VI and Avantor, Inc.—leads me to conclude that, at least at some points throughout his employment, Centrella subjectively believed VM employed him.

[115] Ordinarily, whether a person is employed by a specific entity might tend to support the conclusion he or she is not employed by another entity. As that relates here, any momentum Defendant might gain from that notion is abruptly halted by the mountain of evidence showing that VM employed Centrella. Thus, if Avantor, Inc. employed Centrella, it did so jointly with VM and not to VM's exclusion.

[116] *In re Genelux Corp.*, 2015 WL 6390232, at *4 (Del. Ch. Oct. 22, 2015).

[117] *Id.* (quoting *Tafeen*, 888 A.2d at 214).

with disputes as to the ultimate entitlement to retain the advanced funds being resolved later at the indemnification stage."[118]

Defendant argues it did not sue Centrella in the Underlying Action in a covered capacity (*i.e.*, "by reason of" his employment). Instead, it asserts, it only sued him for alleged breaches of personal contracts on which equity grants were conditioned—not his employment—so Centrella is not entitled to advancement under the Bylaws.

But the notion that the equity grants were not part of Centrella's employment compensation or "inextricably intertwined" with his employment by VM belies reason.[119] Indeed, the document Defendant puts forward as Centrella's offer letter dedicates an entire section—the largest of the five sections in the letter—to describing the equity grants as "Additional Compensation."[120] So suit over the agreements on which that "[c]ompensation" was provided seems inextricably tied up in Centrella's employment.[121]

---

[118] *Mooney v. Echo Therapeutics, Inc.*, 2015 WL 3413272, at *7 (Del. Ch. May 28, 2015) (quoting *Holley v. Nipro Diagnostics, Inc.*, 2014 WL 7336411, at *8 (Del. Ch. Dec. 23, 2014)).

[119] *Ephrat v. MedCPU, Inc.*, 2019 WL 2613281 (Del. Ch. June 26, 2019) (quoting *Brown v. LiveOps, Inc.*, 903 A.2d 324 (Del. Ch. 2006)).

[120] J9.

[121] Notably, the offer letter that Defendant puts forth alternates between its use of "Avantor" (which is how Defendant typically refers to the broader organization) and "Avantor, Inc." *Id.* But it only uses the latter when referring to a particular equity incentive plan. *Id.*

Even a cursory review of the complaint in the Underlying Action makes this point evident.[122] Therein, Avantor, Inc. alleges that "[b]y accepting his employment, and signing the . . . Agreement, Centrella expressly acknowledged that he agreed to be bound by the terms of the restrictive covenants . . . ."[123] Moreover, Defendant sued Centrella to enjoin his use of confidential information that he acquired during his employment.[124] And, as is the case here, "[w]here the claims asserted against a defendant in an action are based on the misuse of confidential information that the

---

[122] *Mooney*, 2015 WL 3413272, at *5 (Del. Ch. May 28, 2015) ("[C]ourts often can determine whether the 'by the reason of the fact' requirement has been satisfied solely by examining the pleadings in the underlying litigation." (quoting *Holley*, 2014 WL 7336411, at *8)).

[123] J110 ¶ 46.

[124] Here, I am careful to note that the complaint in the Underlying Action defines the term "Avantor" in two separate places. On the first line, the complaint defines "Avantor" as the "Plaintiff Avantor, Inc." *Id.* at 1. But that term is redefined a few paragraphs later to include Avantor, Inc.'s subsidiaries. *Id.* ¶ 5 ("Avantor, Inc. and its wholly owned subsidiaries are hereinafter referred to as ('Avantor')."). And so, when later referring to the capacity in which Centrella learned confidential information, the use of "Avantor" has the latter meaning. For example, the complaint provides that in "his roles at Avantor, Centrella was part of the 'inner sanctum,' and had access to significant, highly-confidential [*sic*] information about the competitive landscape." *Id.* ¶ 11. And in the complaint's prayer for relief, Defendant sought to enjoin Centrella's use of "Avantor's confidential information . . . ." *Id.* at 18–19. Indeed, each reference to the role or capacity in which Centrella was alleged to have learned confidential information is similarly tethered to "Avantor." *See id.* ¶¶ 15, 34, 37, 47, 49. Thus, in the Underlying Action, Defendant sought to enjoin Centrella's use of confidential information irrespective of whether he learned the confidential information as an Avantor, Inc. employee or a VM employee. *See generally* Stip. ¶¶ 5–6. And I am frankly not certain one could draw anything other than an artificial distinction here—which seems particularly inappropriate in advancement cases—given the nature of the two entities' relationship.

defendant learned in his or her official corporate capacity, that action qualifies as being asserted 'by reason of' that corporate capacity."[125]

Having brought suit to enjoin Centrella's use of confidential information that he learned as a VM employee, and consistent with our law's broad reading of the "by reason of" language, I conclude that Centrella was threatened to be made a party, or was made a party, to the Underlying Action by reason of his employment by VM.[126]

---

[125] *Pontone v. Milso Indus. Corp.*, 100 A.3d 1023, 1052 (Del. Ch. 2014).

[126] Avantor, Inc. cites a variety of cases. Each is either distinguishable or does not support Avantor, Inc.'s use of it. *Parks v. Horizon Holdings, LLC*, addressed a conflicts of law question on cross-motions for partial summary judgment arising from a contractual non-solicitation provision entered during the sale of a business. 2022 WL 2821337 (Del. Ch. July 20, 2022). It does not arise from the advancement context in which the "by reason of" language holds legal significance and is interpreted broadly in favor of advancement. *Id. Brick v. Retrofit Source, LLC*, although an advancement case, was brought pursuant to a limited liability company agreement which purported to extend advancement to officers of a holding company's subsidiary but gave the holding company's board "sole discretion" over whether to extend indemnification rights. 2020 WL 4784824 (Del. Ch. Aug. 18, 2020), *aff'd*, 249 A.3d 386 (Del. 2021). The board used that discretion to deny advancement to the plaintiff—thus, the Court concluded the plaintiff was "not entitled to advancement in his capacity as an [Opco] officer." *Id.* at *6. And since "there [was] no issue of disputed material fact that the proceedings for which [the plaintiff] claim[ed] advancement [were] solely by reason of the fact that he was [an officer] of Opco," the Court concluded—as Defendant notes—that this was "not a covered capacity." *Id.* at 7; Dkt. 103, Defendant's Post-Trial Br. ("Def's AB") at 43. By contrast, here, the Bylaws extend mandatory advancement to Centrella as a VM employee, so he is a covered person. And, as a covered person who was sued by reason of his employment at VM, Centrella was sued in a covered capacity. Defendant's further attempts to distinguish *Ephrat v. MedCPU, Inc.*, are similarly infirm. Defendant quotes *Ephrat* for this Court's denial of advancement and quotes the decision as follows: "allegations relat[ing] to competitive activities, including working for and soliciting customers on behalf of a [competitor] . . . did not allege any nexus or causal connection." Def's AB at 45 (quoting *Ephrat*, 2019 WL 2613281, at *8). But Defendant uses an ellipsis here to omit a critical sentence between the two portions quoted from *Ephrat*. That sentence explains why the Court did not award advancement for claims arising from the "competitive activities"—namely, that "[a]s alleged, Petitioners took these actions after they left medCPU, and did not use confidential information Petitioners

Thus, I conclude that Centrella is an Indemnitee under the Bylaws.[127]  As an Indemnitee, Centrella is entitled to "be paid by [Avantor, Inc.] the expenses (including attorney's fees) incurred in appearing at, participating in or defending any such proceeding in advance of its final disposition or in connection with a proceeding brought to establish or enforce a right to . . . advancement of expenses."[128]  In other words, Centrella is entitled to mandatory advancement under the Bylaws.  And, under the express terms of the Bylaws, the burden falls to Avantor, Inc. to show Centrella is not entitled to advancement.[129]

---

obtained by reason of the fact of their positions with medCPU in doing so." *Ephrat*, 2019 WL 2613281, at *8.  Frankly, this omitted text eviscerates Defendant's articulation of the Court's conclusion.  And, contrary to Defendant's argument, it shows *Ephrat* actually supports Centrella's position that Avantor, Inc. sued him by reason of his employment with VM given its focus on his use of confidential information learned pre-separation.  In further support of Centrella's argument, after surveying cases on the issue, the *Ephrat* Court explained that it would "follow the weight of authority under *LiveOps*, *Pontone*, and *Thompson*, and conclude that medCPU's allegations relating to post-separation use of confidential information learned pre-separation are 'by reason of the fact' of Petitioners' positions." *Id.* at *7.

[127] As a Hail Mary, Defendant asserts that "the relevant contracts were between Centrella and Avantor, Inc., not between Centrella and V[M]."  Def's AB at 43.  But Defendant has failed to produce a single *signed* contract between Avantor, Inc. and Centrella.  Even the PSA, which Defendant sought to enforce in the Underlying Action, is unsigned.  Indeed, that PSA is an attachment to an email Michael Bernstein sent Centrella in January 2020 to sign and return.  J110; J16.  The PSA differs from the one Henson sent and states that it "is between Avantor, Inc., o*n behalf of itself and its affiliates* (collectively, 'Avantor') . . . and Marc Centrella ('Associate'), who is or will be employed."  J16 (emphasis added).  It then refers to the "Associate's employment with Avantor" (not Avantor, Inc.) and includes a modification provision that is designed to address "[a]ny change of employer *within Avantor (as defined above)."  Id.* (emphasis added).

[128] Bylaws § 7.02.

[129] *Id.* § 7.03.

## B. Centrella Is Entitled To Advancement For Fees And Expenses Incurred After Avantor, Inc.'s Voluntary Dismissal

Defendant next asserts that if the Court awards advancement to Centrella, the advancement should terminate after it dismissed its claims against him in the Underlying Action without prejudice.[130] Defendant's argument has two parts. In the first part, it asserts there is no continuing post-employment threat of litigation to Centrella.[131] In the next part, it asserts any advancement for Centrella's compulsory counterclaims in the Underlying Action should be cutoff because their

---

[130] Defendant asserts its claims were dismissed "as moot." Defendant points to a stipulated order dismissing Defendant's claims against Centrella after Waters withdrew its employment offer and after Defendant decided, "[b]ased on the discovery to date," it "no longer has reason to believe" Centrella used confidential information. J121. As to mootness, one preambulatory clause provides that "Avantor represents that the claims for relief sought by its Complaint are now moot[.]" *Id.* But, rather than dismissing with prejudice, the order provides that "Avantor's claims in the above-captioned action are hereby dismissed, without prejudice." *Id.*

[131] Defendant directs the Court to no case suggesting that one must remain under a continued threat of litigation to receive advancement. And, at least as used in the Bylaws themselves, being "threatened" to be made party to a proceeding by reason of serving at Avantor, Inc.'s request functions as one of several triggers giving rise to indemnification and advancement rights (subject to any necessary demand and undertaking). There is no meaningful dispute that Avantor, Inc. threatened Centrella with litigation after he informed his supervisors "that he was resigning in favor of" employment at Waters. Stip. ¶ 19. Specifically, the parties agree that on "July 28, 2022," Avantor, Inc. informed Centrella that it believed his plan to join Waters would "violate his contractual obligations," which "it intended to vigorously enforce." *Id.* ¶ 20. Although these events triggered Centrella's right to advancement under the Bylaws on July 28, 2022 (again, subject to Centrella delivering a demand and undertaking), the Bylaws do not themselves suggest the right to advancement ends before the "final disposition" of the Underlying Action because the indemnitor dismisses its claims. The use of "final disposition" in Section 7.02 tracks the language in 8 *Del. C.* § 145(e) and means "the final, non-appealable conclusion of a proceeding." *Sun-Times Media Grp.*, 954 A.2d at 397. Here, the Underlying Action (a "proceeding" as defined in Section 7.01 and used in Section 7.02 of the Bylaws) has not reached its "final, non-appealable conclusion[,]" so this remains an action for advancement.

33

"defensive nature . . . ended" when Avantor, Inc. dismissed its claims in the Underlying Action.[132]

To support its argument that Centrella's compulsory counterclaims are not asserted defensively and thus advancement should end as of its dismissal in the Underlying Action, Defendant cites what it refers to as "Delaware authorities cutting off advancement for counterclaims asserted as a response to terminated claims for which advancement had been required."[133] None of the cases Defendant cites actually support that idea. Instead, they support a partially analogous idea related to the implications of amending claims against an indemnitee. Specifically, those cases show that "amendment can eliminate advancement obligations, *but only if* the amendment and the amending party's representations alter the claim in a manner that assures the Court the plaintiff *will not* face litigation that triggers advancement obligations."[134]

Even if I considered our courts' treatment of this partially analogous circumstance as applicable here, Defendant—bearing the burden—still fails.[135] I

---

[132] Def's AB at 50. Defendant does not dispute that Centrella's counterclaims in the Underlying Action are compulsory—it only suggests the counterclaims are not advanced to defeat or offset its claims after Defendant dismissed them without prejudice. *See id.*

[133] *Id.*

[134] *Carr v. Glob. Payments Inc.*, 2019 WL 6726214, at *8 (Del. Ch. Dec. 11, 2019) (emphases added), *aff'd*, 227 A.3d 555 (Del. 2020).

[135] *See* Bylaws § 7.03 ("In any suit brought by the indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder . . . the burden of proving that the indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this Article VII or otherwise shall be on [Avantor, Inc.]."); *see also Krauss*, 2022 WL 665323,

34

remain skeptical that Avantor, Inc.'s voluntary dismissal of its claims without prejudice adequately "assures the Court that" Centrella "will not face litigation that triggers advancement obligations."[136] Indeed, notwithstanding Defendant's assertion that the durational terms of the relevant non-compete provisions it sought to enforce have since expired,[137] the complaint's prayer for relief in the Underlying Action makes multiple references to extensions of the non-compete period pursuant to "applicable tolling provisions" in the relevant agreements.[138] And Avantor, Inc. repeatedly has refused to agree not to reassert certain claims under those agreements against Centrella.[139]

Even at oral argument, the most Avantor, Inc. could muster is that "[t]he company is aware of no facts that would give rise to a claim. The company is not giving a release. It's just not aware of any facts."[140] This is far afield from the clear assurances provided in the cases Defendant cites. For example, in *Carr v. Global*

---

at *4 ("When advancement is mandatory, the company carries the ultimate burden of proving that advancement is not required.").

[136] *Carr*, 2019 WL 6726214, at *8.

[137] Def's AB at 48. Separately, Defendant attempts to use what it claims is the expiration of the non-competes as a central basis for showing Centrella no longer faces a threat of litigation. But this suggests there is a negative inference that Centrella remained under such threat until at least the time of the non-competes' alleged expiry—not, as Defendant argues, as of its dismissal of claims in the Underlying Action.

[138] J110 at 18.

[139] *See id.*; J130.

[140] Dkt. 114, Post-Trial Oral Argument Tr. ("OA Tr.") at 89.

35

*Payments Inc.*, after surveying the relevant cases on the issue, the Court permitted advancement to terminate as to the amended claim predicated on the use of confidential information learned during employment since the indemnitors "ha[d] removed the entire confidentiality cause of action and any indication of reliance upon it, and ha[d] agreed to forgo pursuit of such a claim now or later, in a manner that raise[d] a judicial estoppel against such an action in the future."[141] In *Carr*, the Court stated that "[i]t is significant to my decision that, in addition to their amendment, the [indemnitors] represented to me at argument that they *will not* base their breach of contract claim on any misuse of confidential information."[142]

In Defendant's next case, *Duthie v. CorSolutions Medical, Inc.*, the claims in the underlying action were "barred by principles of issue preclusion[,]" and the "defendants represented to the Court" that "they would not bring any further fraud claims in *any* forum."[143]

But this is an analysis that considers "substance as well as form[,]"[144] so even where an entity makes similar representations to a court, the court need not always agree that it is appropriate to terminate advancement. This is illustrated by Defendant's third and final case on this issue, *Mooney v. Echo Therapeutics, Inc.* In

---

[141] *Carr*, 2019 WL 6726214, at *8.

[142] *Id.* at *7.

[143] *Id.* at *8 (emphasis added) (citing *Duthie v. CorSolutions Med., Inc.*, 2009 WL 1743650 (Del. Ch. June 16, 2009)).

[144] *Carr*, 2019 WL 6726214, at *7 (quoting *LiveOps, Inc.*, 903 A.2d at 329).

*Mooney*, the Court granted advancement for fees incurred in defending against certain amended counterclaims and amended affirmative defenses notwithstanding the indemnitor's "represent[ation] that it is not pursuing any official capacity claims against [the indemnitee] and will not do so."[145]

Here, to the extent this line of cases is applicable to this context—which Defendant has not shown—the cases seem to all include clear representations by the indemnitors that they will not bring advanceable litigation against the indemnitee.[146] This is a representation Defendant refuses to make.

Here, I pause to "reiterate that any doubts should be resolved in favor of advancement. The policy of Delaware favors advancement when it is provided for, with the Company's remedy for improperly advanced fees being recoupment at the indemnification stage."[147] Having considered the totality of circumstances relevant

---

[145] *Mooney*, 2015 WL 3413272, at *6.

[146] I am especially wary of accepting Defendant's assertion that these cases should be applied in equal force to the circumstances at issue here since these circumstances deal with advancing expenses arising from compulsory counterclaims. And, if asserted to defeat or offset the claims in the underlying action, compulsory counterclaims serve as the exception to the "general rule" that "offensive litigation is not advanceable." *Id.* at *11. Defendant does not contest Centrella's argument that his counterclaims were compulsory. Nor does it challenge the notion that, when Centrella first pled his counterclaims in the Underlying Action, Defendant had not yet dismissed its claims. Defendant also does not contest that at the time Centrella first asserted the counterclaims, he did so to defeat or offset Avantor, Inc.'s claims against him. *See* Dkt. 99, Plaintiff's Post-Trial Opening Br. ("Pl's OB") at 26–27; *see also* November 2023 Ruling at 26–29. If raised, there might have been a question related to the timing of Centrella's amendment to his counterclaims since Avantor, Inc. had dismissed its claims against him by that time. But Defendant does not raise this issue.

[147] *Mooney*, 2015 WL 3413272, at *6.

37

to the issues here, even assuming the cases Defendant cites are properly applicable, I remain unassured that Avantor, Inc. will not refile advanceable claims against Centrella. Since Defendant agreed to carry the burden on this issue[148] and has failed to do so, I must reject its arguments as a basis for depriving Centrella of advancement for post-dismissal fees and expenses incurred in the Underlying Action and in connection with his compulsory counterclaims.

## C. Centrella Is Entitled To Complete Fees On Fees

Avantor, Inc. next argues Centrella should only be awarded fees on fees proportional to the theories on which he succeeds in obtaining advancement. In other words, Defendant contends that, if Centrella made a legal argument that either did not pan out or was unnecessary to showing entitlement to advancement, the Court must dock his fees on fees for having made or lost the argument.

In *Stifel Financial Corp. v. Cochran*, the Delaware Supreme Court considered the issue of fees on fees.[149] "Under *Stifel Financial,* if a corporation does not want to incur the obligation to pay 'fees on fees,' it must *expressly* preclude any such

---

[148] *See* Bylaws § 7.03.

[149] 809 A.2d 555, 561–62 (Del. 2002) ("Allowing indemnification for the expenses incurred by a director in pursuing his indemnification rights gives recognition to the reality that the corporation itself is responsible for putting the director through the process of litigation. Further, giving full effect to § 145 prevents a corporation from using its 'deep pockets' to wear down a former director, with a valid claim to indemnification, through expensive litigation. Finally, corporations will not be unduly punished by this result. They remain free to tailor their indemnification bylaws to exclude 'fees on fees,' if that is a desirable goal.").

right."[150]  "This Court has recognized that *Stifel Financial* supports an award of fees for the successful prosecution of advancement claims as well."[151]  And indeed, the policy bases set forth in *Stifel Financial* are "no less applicable to the advancement right than to the indemnification right."[152]

Taken together, "under *Stifel Financial* and its progeny, 'fees on fees' are an inherent right of the party materially successful in asserting a claim for indemnification or advancement unless the corporation, as it may, chooses to [expressly] deny that right."[153]

Here, far from including an express opt-out from fees on fees, the Bylaws expressly provide fees on fees to the "fullest extent permitted by law" if an Indemnitee is "successful in whole or in part" in asserting a claim for advancement under Section 7.02.[154]  In other words, opposite an express opt-out from the default rules governing fees on fees, Avantor, Inc. included an express opt-in to a fees on fees obligation.  Even where an indemnitee is only successful "in part[,]" the Bylaws provide that he is "entitled to be paid" the "expense of prosecuting" such suit.[155]

---

[150] *Weaver v. ZeniMax Media, Inc.*, 2004 WL 243163, at *7 (Del. Ch. Jan. 30, 2004) (emphasis added).

[151] *Id.* at *6.

[152] *Id.*

[153] *Id.* at *7.

[154] Bylaws § 7.03.

[155] *Id.*

This language leaves no question that even a partially successful action by Centrella for advancement under Section 7.02 obligates Avantor, Inc. to pony up. Further still, Centrella is entirely successful on his claim for advancement, so, even under the default rules governing fees on fees, a partial award would not be justified. Accordingly, Centrella is entitled to a full award of fees on fees.[156]

But Avantor, Inc.'s argument that Centrella should only recover fees on fees proportional to the success of the respective theories on which he prevails fails for another reason. Namely, our law is not concerned with which theory a party prevails on when it comes to apportioning fees on fees for varying levels of success. Instead, it is concerned with the actual success achieved.

Consider, for example, an action in which an indemnitee seeks advancement on several different, independently sufficient theories. It seems that courts can, and often do, find one theory successful and see no need to address the other duplicative

---

[156] Centrella asserts that, if awarded advancement in this action, he is also entitled to pre- and post-judgment interest. Defendant does not contest this. "In Delaware, prejudgment interest is awarded as a matter of right." *Pontone*, 100 A.3d at 1058 (quoting *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 826 (Del.1992)). "Prejudgment interest accrues at the legal rate set forth in 6 *Del. C.* § 2301(a) and is compounded quarterly." *Creel v. Ecolab, Inc.*, 2018 WL 5733382, at *10 (Del. Ch. Oct. 31, 2018); *see also Sweeney v. Sweeney*, 2024 WL 3040424, at *14 n.172 (Del. Ch. June 18, 2024) ("Under Delaware law, where neither party submits evidence showing the appropriate rate of interest, the court typically awards 5% over the Federal Reserve discount rate compounded quarterly."); *Underbrink*, 2008 WL 2262316, at *19 & n.174. Thus, Centrella is entitled to pre-judgment interest at the legal rate provided in 6 *Del. C.* § 2301(a) compounded quarterly. Moreover, "Delaware courts routinely grant post-judgment interest in advancement cases." *Underbrink*, 2008 WL 2262316, at *19. So, I further grant Centrella "post-judgment interest on the full amount of the judgment, including that part comprised of pre-judgment interest, compounded quarterly at the legal rate under 6 *Del. C.* § 2301(a)." *Id.* (footnote omitted) (citing *Brandin v. Gottlieb*, 2000 WL 1005954 (Del. Ch. July 13, 2000)).

40

theories seeking the same relief. Must courts now evaluate the success of each theory lest an indemnitee only be awarded fees on fees for the specific, narrow theory on which he officially prevailed? No.

Indeed, such an absurd conclusion would countermand both the nature of advancement actions as summary proceedings and the high degree of deference afforded to the plight of an accused corporate servant forced to pay his litigation fees and expenses out-of-pocket. The policy supporting an award of fees on fees seems perhaps all the more relevant in instances where, as here, it is the servant's indemnitor that has sought to prosecute claims against him. Accordingly, Centrella is entitled to a full award of fees and expenses incurred in prosecuting this action for advancement.

## III.    CONCLUSION

For the foregoing reasons, Centrella prevails in full on his claims for advancement and fees on fees. "This Court routinely orders parties in advancement proceedings to follow the procedures set out in *Danenberg v. Fitracks, Inc.*, 58 A.3d 991 (Del. Ch. 2012)."[157]    This case is no exception. The parties are to confer

---

[157] *Rhodes v. bioMerieux, Inc.*, 2024 WL 669034, at *14 (Del. Ch. Feb. 19, 2024); *Id.* ("Under the *Fitracks* Procedures, the senior Delaware counsel for the party seeking advancements oversees the preparation of a detailed submission supporting the advancement request and certifies that the amounts sought fall within the scope of the advancement right. If the responding party objects, the senior Delaware counsel for the responding party oversees the preparation of a similarly detailed set of objections and certifies that those amounts fall outside the scope of the advancement right. After the exchange of written materials, the senior Delaware lawyers confer in good faith in an effort to resolve disputes without court involvement." (quoting *White v. Curo Texas Hldgs., LLC*, 2017 WL 1369332, at *1 (Del. Ch. Feb. 21, 2017))).

promptly on a form of order implementing this decision and include procedures consistent with the procedures set out in *Fitracks*.